BROWER v. The WATER WITCH. See Case No. 2,895.

## Case No. 1,971.

BROWER et al. v. The WATER WITCH.

SHELDON v. SAME.

CLIFTON v. QUANTITY OF COTTON.

[16 Leg. Int. 349;[1] 19 How. Pr. 241; 42 Hunt, Mer. Mag. 67.]

Circuit Court, S. D. New York. Oct. 11, 1859.[2]

SHIPPING — CARRIAGE OF GOODS — LIABILITY FOR DAMAGE—CHARTER PARTY— PRACTICE IN ADMIRALTY—PLEADING.

[1. Consignees recognized by the master of a vessel as the proper parties to receive a consignment, and to whom it was delivered by him and freight demanded, and who have made advances upon the goods in the usual way, can maintain a suit against the vessel for damages to the goods, although there were no bills of lading executed.]

[2. A master who receives goods on board his vessel, and carries them to their destination, subjects the vessel to the common-law liability of carrier, though there is no bill of lading or other agreement entered into. But the vessel is bound by written agreement fixing the terms upon which the shipment is to be made.]

[Cited in The Euripides, 52 Fed. 163.]

[3. An agreement repugnant to the terms of a charter party, of which a shipper has no notice, cannot affect his interests injuriously.]

[4. Where a cargo of cotton was badly stowed, and insufficient attention paid to the sea water in the vessel by using the pumps, thus damaging the cotton, the vessel is liable.]

[5. A libellant who insists upon recovering damages to a cargo in an independent suit cannot apply any portion of same by way of abatement in a suit for the recovery of freight on the cotton, although he has set up, in his answer to the latter suit, such damages by way of abatement.]

[6. A portion of a cargo of cotton was shipped on deck, in violation of a fair inference from the agreement of carriage. The freight to be paid was the usual rate for cotton under deck. *Held*, on a question of recovery for the full freight mentioned in the agreement, that the freight of the portion carried on deck should be reduced to deck freight, and the vessel held responsible for its transportation under deck.]

[Appeal from the district court of the United States for the southern district of New York.

[In admiralty. Libels by John H. Brower and others against the brig Water Witch, by William H. Sheldon against the same, and by John Clifton against a quantity of cotton. The district court decreed in favor of libellants in the first two cases, but dismissed the libel filed by Clifton. Affirmed as to the libels filed against the brig, but reversed as to the libel filed by Clifton against the cotton.]

Benedict, Burr & Benedict, for libellants in first two suits.

---

[1] [Reprinted from 16 Leg. Int. 349, by permission.]

[2] [Affirmed by the supreme court in Clifton v. Sheldon, 1 Black (66 U. S.) 494. See Sheldon v. Clifton, 23 How. (64 U. S.) 481.]

Beebe, Dean & Donohue, for libellant in third suit.

NELSON, Circuit Justice. The libels in the two first cases were filed to recover damages for injuries to a cargo of cotton shipped in the brig Water Witch, from Lavacca, on the bay of Matagorda, Texas, to this port, in May, 1854. The libellants were the consignees of the cotton. The libel in the third case was filed by the owner of the brig to recover his freight money. A special contract was made between the shipper at Lavacca and one Mitchell, who represented himself as agent of the vessel. She lay at the port of Indianola, situated on the same bay as Lavacca, but several miles distant. The cotton was carried in a lighter from Lavacca to the vessel. After it was delivered from the lighter and received on board the vessel, the master refused to sign the bills of lading, upon the ground that the cotton was not in good order and condition, and pending this dispute he sailed for New York with his cargo. The shipper, on learning that the vessel had sailed without having signed the bills of lading, forwarded the bills unsigned to the consignees named in them, stating the circumstances of the refusal of the master to sign them. The consignees made advances upon the cotton. On the arrival of the vessel at this port, the master informed the consignees to whom the cotton was consigned, and discharged his cargo, but in a very damaged condition. He also demanded his freight from them, the payment of which was refused, and the above suits afterwards instituted by the respective parties.

It is proper to state further that the brig was under a charter-party from the owners to a firm in New Orleans, and that Mitchell, with whom the contract was made for the shipment of the cotton, represented this firm. By this contract the shipper was to deliver the cotton at Lavacca, to be received on lighters by Mitchell, and placed by him at his expense on board of the vessel, to be carried to New York for the freight of one and a quarter cents per pound. This agent also objected to the bills of lading, because they did not contain a stipulation that part of the cotton might be shipped on deck. The shipper refused to admit such a stipulation, as it was not contained in the agreement between the parties, which was in writing.

1. We perceive no well founded objection to the right of the assignees to maintain these suits. They were the persons to whom the cotton was shipped, and were recognized by the master as the proper parties to receive it, and to whom it was delivered by him, and the freight demanded. They had made advances upon it in the usual way, and as between them and the owners for whose benefit the advances were made, they had the same interest in the cotton as if the bills of lading had been duly executed.

2. We should have no difficulty in this case

in holding the carrier to the common law liability on the shipment of the cotton, even if no bill of lading or other agreement had been entered into by the master, as his consent to receive it on board his vessel and carry it to the port of destination subjected the ship to this liability. But in addition to this, the agent of the charterers, in whose service the brig was at this time, and who were interested in procuring cargo, entered into a written agreement fixing the terms upon which the shipment was to be made. The vessel was bound by it, and although it does not contain the stipulations usual in bills of lading, it carries with it by implication the common law obligations of a common carrier. We lay entirely out of view the charter-party between the owner and the firm in New Orleans, as the shipper in this case had no notice of it; and if, therefore, there had been anything in this agreement repugnant to the charter-party, it could not be permitted to affect injuriously his interests.

3. Having disposed of these somewhat technical questions, we come to the main question in the case; and that is, whether or not the damage to the cotton was the natural, if not necessary, effect of its condition at the time of shipment developed in the course of the voyage, or produced by the dangers of the navigation, without any fault of the ship, or whether all or any part of it is attributable to bad stowage, or absence of proper care and attention on the part of the master. Some one hundred bales of cotton were shipped on deck. It has been argued that the right thus to ship it is fairly to be inferred from the terms of the agreement between the shipper and agent of the vessel. We think not. It is also argued that there was a usage of the trade between the ports of Texas and New York in the shipment of cotton which justified the master in shipping it on deck. We think that the proof fails altogether to establish any such usage. The freight to be paid was the usual rate for cotton under deck.

It has further been strongly argued that the whole damage to the cotton, as disclosed on discharging it at this port, was the effect of the country damage existing at the time of shipment, or was produced by a storm which the vessel encountered in the voyage. The evidence in the case is very conflicting upon these questions, and difficult, indeed impossible, to be reconciled. The court below came to the conclusion that, according to the weight of it, the cotton had sustained sea damage, for which the vessel was responsible. We are inclined to concur in this conclusion. The testimony is pretty strong that the cotton was badly stowed, and, also, that sufficient attention was not paid to the sea water in the hold of the vessel by using pumps. The cotton was very wet when discharged from the hold of the ship.

The court below, in the case of the libel of the owner to recover freight, dismissed the same after applying so much of the money awarded for damages to the cotton as equalled the freight money. This, we think, was erroneous. The consignees had each filed his libel to recover this damage, and has succeeded. It is true each set up, in his answer to the suit for freight, damage to the cotton by way of abatement of the sum claimed. But these parties could not thus split up the claim for damages by applying a portion in extinguishment of freight money, and then ask for a decree for the excess over this sum. If they insist upon recovering damages on an independent suit they cannot apply any portion of them, by way of abatement, in the suit for the freight money. The damages are an entirety. We must, therefore, reverse the decree in the case of Clifton v. Quantity of Cotton [Case No. 2,895], and direct a decree to be entered for the libellant for the full amount of the freight money and interest, with costs. And, as the full amount of freight, at the rate of 1¼ cents per pound will be recovered, the error will be corrected in the court below, reducing the freight of the portion of the cotton carried on deck to deck freight, and at the same time holding the brig responsible for the transportation under deck. The decrees in the other two suits are affirmed with costs.

[NOTE. Sheldon appealed from the final decree requiring him to pay $1,752.22 of the freight, but the appeal was dismissed for want of jurisdiction. Sheldon v. Clifton, 23 How. (64 U. S.) 481.

[Clifton also appealed, but the supreme court affirmed the decree, holding that a portion of the damages could not be applied to extinguish the freight, and a decree had for the excess; that the refusal of the master to sign bills of lading did not affect the case; that the ship, having received the cargo, and carried it to the consignees, and then libeled the cargo for freight, was estopped to deny her liability to deliver in like good order as received, with the usual exceptions; that the contention that the language of the agreement permitted the cargo to be carried on deck, and that the phrase "capacity of the vessel" admitted of such construction, could not be upheld, in view of the facts that the owners of the cargo refused to have such agreement incorporated in the bill of lading, failure of the evidence to support the allegation of any such agreement, and the agreement to pay under-deck freight; that the objection that Sheldon was not consignee had no foundation in law or in fact, libellant having treated him as such, and he having made advances on the cargo; and that the question of sea damage, being one of fact, and having been settled by the concurrent finding of both courts below, could not now be inquired into. Clifton v. Sheldon, 1 Black (66 U. S.) 494.]