WEST NEW JERSEY SOC., COMMITTEE OF, v. MORRIS. See Case No. 3,065.

WESTON (BABCOCK v.). See Case No. 703.

---

## Case No. 17,452.

### WESTON et al. v. FOSTER et al.

[2 Curt. 119.] [1]

Circuit Court, D. Massachusetts. Oct., 1854.

CHARTERED SHIPS — AUTHORITY OF MASTER — AMOUNT OF CARGO.

Though the honest opinion of a competent master, that he has taken on board all the cargo his vessel will safely carry, is not absolutely binding on the charterer, it is entitled to very great weight, and can be controlled only by decisive evidence of a mistake on his part.

[Cited in Boyd v. Moses, 7 Wall. (74 U. S.) 319.]

[This was a libel by Gershom B. Weston and others against Jacob Foster and others on a charter party.]

E. D. Sohier, for libellants.
Mr. Thaxter, contra.

CURTIS, Circuit Justice. This is a libel on a charter-party certified into this court from the district court, on account of the judge's relationship to one of the parties. The case is this: In March, 1853, the libellants let to the respondents their brig Smyrna, for a voyage from Boston to Pernambuco, and thence back to Philadelphia, New York, or Boston, at the option of the charterers. The whole of the vessel, except the cabin and room for the crew, sails, cables, and provisions, was let, and the owners covenanted to receive all such lawful merchandise as the charterers should choose to put on board. The charterers covenanted to pay for the round voyage, the sum of twenty-six hundred dollars, and fifty dollars more if New York should be elected as the return port. The brig carried a cargo to Pernambuco, and there delivered it; and the agents of the charterers then elected to load her with guano, which had been discharged from a vessel put in there in distress. Guano was received on board by the master of the brig, and stowed, partly in bags, and partly in bulk, until the master gave notice that he could take no more. The charterers' agents called a survey, and upon their report insisted that the master should receive more, to the extent of fifty tons. The master declined to receive more, upon the ground that no more could prudently be car-

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

ried. The brig sailed, arrived at Philadelphia, and delivered her cargo. The charterers insist that there should be deducted from the freight money remaining due, the amount they would have received for bringing fifty tons more of guano from Pernambuco to Philadelphia, which is shown to be six hundred dollars..

The principal question in the case is, whether the libellants have kept their covenant by receiving on board at Pernambuco, all the cargo which the charterers had a right to require the master to receive there. The libellants assert a right to the entire freight. They must show that they have entitled themselves to it, by performing all that, on their part, was to be done, to earn it. It is therefore incumbent on them to satisfy the court that the refusal of the master to receive more cargo was justifiable. To do so, they have produced the testimony of the master and mate, and of the builder of the brig, and of two marine inspectors at Philadelphia. The master testifies that he had sailed the brig eight years. That she is a deep and narrow vessel, and would not safely bear to be loaded deeper than twelve feet aft, and eleven feet forward. That she was loaded to that depth when she sailed from Pernambuco. That guano stowed in bulk, as the top part of this cargo was, hardens, and cannot be broken out, in case of necessity, to relieve the vessel at sea. And that he refused to take any more cargo, because he considered the vessel loaded with all she could safely carry to the United States. The mate testifies substantially to the same effect as the master. Captains Pedric and Gallagher, who appear to have had ample experience as shipmasters, and have long been marine inspectors, in the employment of the district court of the United States, for the Eastern district of Pennsylvania, and of underwriters in the port of Philadelphia, were called by the master of the Smyrna, on her arrival in that port, to examine her, and report on the sufficiency of her lading; and they then reported, and now testify, that in their opinion she was laden as deep as prudence would permit. The builder of the Smyrna also testified, that she ought not to be laden deeper than eleven feet six inches aft, and ten feet six inches forward, and he gives her dimensions, and states the elevation of her deck and transom timbers above the water when thus laden, in support of his opinion. On the other hand, Captain Hunt, who was one of the survey called at Pernambuco by the shippers, and Captain Hooper, who lay alongside the Smyrna there, depose that she was not fully laden; that she could have taken fifty tons more, and the former says, if he had commanded her, he should have loaded her at least a foot, and the latter says, at least two streaks deeper. Captain Hunt also testifies that when he examined her, which was before her anchors, chains, provisions, and water were in, she drew only eleven feet six inches aft, and ten feet three inches forward.

Upon these proofs, I think the weight of the evidence in favor of the plaintiff. Corroborated as it is, I attach much importance to the master's deposition. Being of competent skill and experience, as it is not questioned he is, and be-

ing well acquainted with the brig, his judgment fairly and deliberately exercised, should go far to settle the case. How deep a particular vessel may safely and prudently be laden with a particular cargo, is a matter of judgment. Both the owner and charterers know, when the contract of affreightment is made, that the master, in a foreign port must, at the time, decide this question. They know also, that inasmuch as differences of model and spars, and perhaps other circumstances, affect this question, a master who knows his particular vessel, and her performance at sea, can judge better than a stranger what cargo she will safely carry. And though the master is the agent of the ship-owner in receiving and transporting cargo, yet he may be considered, as relied on by the shipper not to receive too much cargo, and thereby subject it to risk of damage and loss. Not to overload his vessel, is a duty which the master owes to all concerned. They have a right to expect him to have competent skill and judgment in this particular, and fairly and carefully to exert them. They are not absolutely bound if he makes a mistake. But when he is a person of sufficient skill and judgment, and peculiar knowledge of the vessel, and decides honestly and faithfully, very clear evidence of a mistake should be required before his act is pronounced against by the court.

I do not find reason seriously to doubt that the master did act honestly, and was possessed of due skill and knowledge. He had sailed this brig eight years, and must have been peculiarly well acquainted with her capacity and performance at sea. He had no interest, so far as I perceive, to refuse to bring a proper amount of cargo. Though he may be supposed to look to the interest of the owners, rather than of the charterers, and to desire to make a quick passage, yet he must have known that it was not for the interest of the owners, that he should bring less than a proper cargo, and thus entitle the charterers to have a deduction made from the freight money. The mate, who appears to have testified with fairness, supports the master. The marine inspectors at Philadelphia give an opinion to the same effect, which seems to me entitled to quite as much weight as the opinion of Captains Hunt and Hooper.

But it is strongly urged that there are facts in the case which prove that if the master acted fairly, he made a mistake. The argument is, that both the master and mate say, that the brig might be safely loaded down to twelve feet aft and eleven feet forward. And though they testify she was so loaded, yet that in point of fact she was not. That Captain Hunt deposes, when he examined her, she drew only eleven feet six inches aft and ten feet three inches forward; and though this was before her provisions, water, anchors, and chains were put on board, they could make but a slight difference. And that this is corroborated by the fact, that, according to the testimony of the marine inspectors, she drew only twelve feet aft when she arrived at Philadelphia; and as she was there in fresh water, less buoyant than sea water, she must

have drawn four inches less than twelve feet, when she left Pernambuco.

Now, as to the discrepancy between her depth at Pernambuco as sworn to by the master and mate, and by Captain Hunt, it is to be observed that they are speaking of different times. The latter, before, the former, after her provisions, &c., were taken on board. It is true, Captain Hunt says, these would produce scarcely a perceptible effect on her draft; but the master of the Smyrna, who certainly had better means of knowledge than Captain Hunt, says it would affect her draft nine inches. This statement of the master of the brig is supported by her builder, who speaks to the effect on her draft of increasing her burden when brought to her bearings; and says she would then go down rapidly. Captain Hunt and Captain Sprague, the master, and Mr. Barbour the mate of the brig, may all have testified truly, if the weight of the anchors, chains, provisions, and water is sufficient to account for the discrepancy. The anchors weighed 2,300 pounds; the provisions about 3,500 pounds; the water, at eight pounds to the gallon, 5,600 pounds; and there were 160 fathoms of chain, the weight of which does not appear. Upon this state of the evidence I cannot declare, that laden as this vessel was, when these things were taken on board, it is so clear they cannot account for the discrepancy, that the master and mate are discredited.

As to the four inches on account of fresh water at Philadelphia, it must be admitted that if her draft at Philadelphia is taken to have been exactly twelve feet, and the difference between the effect of salt and fresh water is admitted to have been precisely four inches, and the weight of all on board the brig was the same at Philadelphia, as at Pernambuco, it would follow that the vessel drew at Pernambuco, four inches less than the master and mate swear she drew there. But these assumptions are not so certainly correct, as to induce me to pronounce the testimony of these two witnesses to be untrue. In the first place, the inspectors at Philadelphia do not say the brig drew precisely twelve feet. The expression in their report is, "full twelve feet," and one of them uses the same phrase twice in his deposition. In the next place, though it is proved that four inches is the usual allowance for the difference between the effect of the water at Philadelphia and at sea, I cannot suppose this is ascertained, or intended to be spoken of with entire precision, as being exactly that amount of effect on all vessels. Again, the weight of what was on board the brig was not the same at Pernambuco and Philadelphia. Her provisions and water certainly were not the same. Whether a cargo of guano loses weight on such a voyage I do not know. I am not informed by the evidence, and there is no presump-

tion that it does not; and it must be borne in mind that the respondents have to lay the foundation for this argument to discredit the master and mate by assuming that the weight of what was on board was not lessened. Let it be considered that we are dealing with a discrepancy of four inches only; that the water must be very smooth to enable an observer to speak with entire precision; that substantial accuracy is all that can be expected; and I think it would be going too far to say that the master and mate are not to be believed, when they testify to her draft of water, at the time the brig sailed from Pernambuco.

One other fact is relied on by the respondents. The mate deposes, on his cross-examination, that the brig brought from Philadelphia to Boston one hundred and seventy-nine tons of coal. This is twenty-six tons more burden than her cargo of guano. But he also says she drew twelve feet aft and eleven feet four inches forward; that she was too deep, and not in proper trim. I do not perceive how any inference can be drawn from this, except that the master, on this summer passage from Philadelphia to Boston, did overload his vessel. And so in reference to the passage from Rio, when he brought one hundred and seventy-seven tons of coffee in bags; it is obvious from the master's statement that this cargo could not have prudently been taken on board if it had been guano in bulk. Coffee in bags can be broken out and shifted; guano in bulk cannot. It requires to be picked up with pickaxes. On this coffee voyage it was found the vessel was out of trim, and it was necessary to fill the cabin with coffee bags, leaving only just room enough for the master and officers to live there. To sail from Pernambuco for Philadelphia with a cargo of that burden, which could not be handled to trim or lighten the ship in case of necessity, and which is so peculiarly liable to damage by sea water, does not appear to me to have been demanded of the master, by his duty to the charterers. My conclusion is, that the brig did take on board at Pernambuco, such cargo as the charter-party required, and consequently that the whole charter money was earned.

One other question is raised. The consignees of the guano in Philadelphia refused to receive it in bulk. The master got bags in which to land it. It does not appear in this case whether the refusal of the consignees to receive the cargo in bulk was rightful or not. If wrongful, the master could not, by yielding to it, impose this charge on the charterers. It is therefore disallowed.