THE ADDISON E. BULLARD.

TURNER et al. v. CARGO OF RESAWN PITCH PINE TIMBER AND LUMBER et al.

(District Court, N. D. Florida. June 14, 1918.)

1. SHIPPING ⟨⟩49(2)—CHARTERERS—FREIGHT MONEY—"LAWFUL MERCHANDISE."

Under a charter to furnish a full cargo of lawful merchandise and to pay $30 per gross ton delivered to vessel and for not less than 2,250 gross tons, her dead weight capacity, the charterer loading lumber, which was "lawful merchandise," into all the cargo space, was bound to pay for 2,250 gross tons, though the cargo loaded was less.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Lawful Merchandise.]

2. EVIDENCE ⟨⟩448—CONSTRUCTION OF CHARTER.

In the construction of a charter, evidence of contemporaneous transactions and correspondence is competent, if aiding in reaching the true intent of the parties, or when explaining the meaning of ambiguous words, but not to alter or modify plain words.

3. SHIPPING ⟨⟩39—CHARTER—RIGHTS OF PARTIES.

The charter signed, must be taken to express the true and final intendment of the parties, and courts may not substitute a different contract, if the agreement may work unexpected hardship.

4. SHIPPING ⟨⟩45—DISCRETION OF MASTER—DECK CARGO.

The master, if competent, has discretion in the manner of loading, the quantity to be taken on deck or elsewhere, consistent with the vessel's seaworthiness in view of the voyage, and, if acting in good faith, his judgment is controlling, though he may not modify the owners' contract for a positive undertaking.

5. SHIPPING ⟨⟩58(2)—REFUSAL OF CARGO—MASTER'S DISCRETION—EVIDENCE.

Evidence *held* not to show an arbitrary abuse of the master's discretion in refusing to take a greater deck load of lumber under a charter whereby the vessel was to take a full and complete deck load consistent with seaworthiness.

6. SHIPPING ⟨⟩44—CARGO SPACE—"PROVISIONS."

Where the charter of a schooner specifically reserved space for "provisions," and required the use of the vessel's steam winches, the term "provisions" included coal.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Provision.]

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. SHIPPING ⊜⟶39—CARGO SPACE—PROVISIONS—MASTER'S DISCRETION.
    The master's judgment as to the kind and quantity of provisions permitted under the charter is generally controlling.

In Admiralty. Libel in rem by Horace Turner and others, owners of the schooner Addison E. Bullard, against a Cargo of Resawn Pitch Pine Timber and Lumber, and in personam against Allen & Freiderichs. Decree for libelants.

Scott M. Loftin, of Jacksonville, Fla., for libelants.

John C. Hollingsworth, of New Orleans, La., and W. A. Blount, Jr., of Pensacola, Fla., for respondents.

SHEPPARD, District Judge. This is a case of libel, brought by the owners of the schooner Addison E. Bullard, in rem against the cargo, and in personam against Allen & Freiderichs, charterers of the vessel. The Bullard was chartered to take a cargo from Pensacola, Fla., to Genoa, Italy. The merits of the controversy turn on the construction of that clause of the charter party which reads substantially:

"* * * Charterers engage to provide and furnish the vessel a full and complete cargo of lawful merchandise, understood no explosives to be shipped. Vessel to furnish the use of her steam winches and steam to drive them. Vessel agrees to take a full and complete deck load consistent with seaworthiness. Charterers to pay the owners or agents for the use of said vessel during the voyage at the rate of $30 per gross ton of 2,240 pounds, delivered to vessel, but charterers to pay freight on not less than 2,250 gross tons, vessel's dead weight capacity."

The cargo furnished was lumber, and when 1,630 tons had been loaded on the vessel the master refused to take further deck load. Charterers contend that they were entitled to load 2,250 tons, or vessel's dead weight capacity, and, when further cargo was refused, presented bills of lading for 1,630 tons at $30 per ton, which the master refused to sign, claiming that he was entitled to clean bills of lading for 2,250 tons. The owners thereupon libeled the cargo and the charterers in personam for $67,500, minimum freight claimed under the charter party.

The respondents answered that under the charter party the owners were entitled to freight only for cargo actually laden, at the rate of $30 per ton, that the master had refused a full and complete deck load, and that freight space which charterers, were entitled to, the master had arbitrarily withheld for coal. Pending litigation, parties entered into an agreement by which the vessel was allowed to go on the voyage, leaving the question of freight due and payable under the charter to be adjudicated. Except for the question whether the master took a full and complete deck load consistent with the vessel's seaworthiness, the solution of the controversy is to be determined by ascertaining the respective rights of the parties when the cargo loaded consumed the cargo space, but fell short of the minimum freight or vessel's dead weight capacity. There is also the incidental question that the master consumed cargo

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

space with unnecessary coal but this, like the other question involved, is determined by the terms of the charter party.

[1] The conspicuous part of the undertaking, as ascertained from the contract, was that the charterers might load a cargo of "lawful merchandise," and the owners recognizing the option of the charterers to choose any class of cargo, so long as it was "lawful merchandise," excluding explosives, it is plain that they undertook by the charter to protect themselves from any loss of freight, should the charterers exercise their option to load a bulky, but light, cargo. Hence this provision in the charter:

"Charterers to pay freight on not less than 2,250 gross tons, vessel's dead weight capacity."

This clause is seemingly definitive of what charterers were to pay freight; that is to say, on not less than 2,250 gross tons. Under the designation "lawful merchandise," obviously, might be included many kinds of cargo, as, for instance, ore or salt, which would consume, of course, less space per ton than a cargo of sponges or excelsior, and, as charterers had the option on the kind of cargo, the owners, with a view for their protection, inserted the stipulation:

"Charterers to pay freight on not less than 2,250 gross tons, vessel's dead weight capacity."

From the evidence it appears that, when the vessel was engaged, charterers contemplated furnishing a cargo of tobacco; but the cargo actually provided was lumber, and when 1,630 tons had been loaded, a portion of it on deck, the master objected to further loading, because, in his opinion, more deck load would not be "consistent with the vessel's seaworthiness." It may be conceded that the 1,630 tons was not the vessel's dead weight capacity; but the language of the charter does not support the contention that the vessel was warranted to take 2,250 gross tons of lumber. Besides, lumber cargoes are not reckoned by tons, but in standards or feet, and this custom the parties will be deemed to have had in contemplation when they made the contract. The charterers exercised their right to load lumber, which was lawful merchandise; but, when they did so under a tonnage contract, with a provision for minimum freight on 2,250 tons, then, under the terms of the charter party, they were bound for the minimum freight, irrespective of the character of cargo.

[2] To induce a different interpretation, charterers offered much testimony of contemporaneous transactions and correspondence between the parties. Such evidence is competent and helpful, when it may assist in arriving at the true intent of the parties, or when it may explain the meaning of ambiguous terms found in the written contract but never to alter or modify the plain words of the agreement.

[3] The correspondence between the parties and the charterers' testimony, explaining their understanding of the negotiations, are strongly persuasive that the contract executed was different from the one originally contemplated by charterers; but the instrument

itself must be taken to express the true and final intendment of the parties. Courts may not substitute a different contract between the parties, if perchance the written agreement works unexpected hardship. Brawley v. United States, 96 U. S. 174, 24 L. Ed. 622.

[4, 5] Coming now to the master's refusal to take more deck load, it is objected by respondents that the master's course was arbitrary, and the evidence was voluminous in an endeavor to show that the vessel did not, in fact, have a full and complete deck load. The stevedore, who loaded the vessel, was of the opinion that more load could have been stored on the flush deck, but admitted that he made no investigation of the condition of the main deck, or the supports of the flush deck, and the evidence discloses his interest in getting as much on board the vessel as possible.

Many others engaged in chartering ships were called as experts as to the vessel's capacity for cargo, to whom were exhibited photographs of the Bullard and other sailing ships of like model and construction, upon which they were asked to express hypothetical opinions as to whether more deck load could have been stored on this ship. With scarcely an exception none knew the Bullard or had any personal knowledge of the construction or the strength of her decks. Not one of them had seen the vessel after the cargo was stored.

The master called a survey at the place of loading, and the report of the surveyors confirmed the judgment of the master, that the vessel had all of the deck load consistent with her seaworthiness. The master may not alter or modify the owners' contract for a positive undertaking; but, if he is competent, the manner of loading, the quantity to be taken on deck or elsewhere, consistent with the vessel's seaworthiness, is left to the discretion of the master, in view of the voyage to be accomplished, and, when he acts in good faith, his judgment is controlling. The weight of the evidence does not show an arbitrary abuse of the master's discretion. Boyd v. Moses, 7 Wall. (74 U. S.) 316, 19 L. Ed. 192; Weston v. Foster, 2 Curt. 119, Fed. Cas. No. 17,452.

[6, 7] Lastly, the objection that 40 tons of coal was an excessive quantity for the voyage, and took up space that should have been left for cargo, may be answered by the suggestion that coal is included in the term "provisions," space for which was specifically reserved by the charter, which also provides for the use of the vessel's steam winches "with steam to drive them." Moreover, there was no testimony to show that 40 tons of coal was excessive for the described voyage, and it is perhaps enough to say on this subject that the master's judgment likewise as to kind and quantity of provisions is generally controlling. Boyd v. Moses, supra; Carver on Carriage by Sea, § 273.

It follows that the libelants are entitled to a decree.