## THE SAIGON MARU.

(District Court, D. Oregon. August 16, 1920.)

No. 7467.

1. **Shipping ⊂⊃58(2)—Evidence held to show chartered ship could have carried larger deck load.**

On a libel by a charterer for damages occasioned by the ship's failure to carry a full cargo, evidence *held* to show that the ship could safely have carried a larger deck load than she did carry, notwithstanding the testimony of her master that a larger load would have been unsafe.

2. **Shipping ⊂⊃44—In determining size of deck load, much weight must be given to judgment of master.**

In determining the size of the deck load which a vessel can safely carry, much weight must be given to the honestly exercised judgment of the master, who was familiar with the capabilities of his ship.

3. **Shipping ⊂⊃44—Chartered vessel cannot carry coal for own purposes other than fuel for voyage.**

Where the entire vessel was chartered to carry lumber, she cannot for her own purposes carry coal not necessary for fuel during the voyage, and thereby diminish her capacity for carrying cargo.

4. **Damages ⊂⊃22—Measure of damages for breach of contract is loss under special circumstances, if known when contract was made.**

The measure of damages for breach of contract is the loss which would naturally follow the breach under ordinary circumstances, or under the special circumstances of the case, if they were made known to the party guilty of the breach at the time the contract was entered into.

5. **Shipping ⊂⊃58(3)—General measure of damages for failure to carry not applicable under war conditions.**

The general measure of damages for failure to transport goods as agreed, which is the difference between the market value at the time and place of delivery at destination and such value at the place of shipment, plus freight and other charges, is not applicable to a breach of charter, when existing war conditions made it impossible to secure other transportation, except at practically prohibitive rates.

6. **Shipping ⊂⊃58(3)—Charterer entitled to lost profits on sale known to vessel's agent.**

Where a vessel breached her charter agreement to carry a full cargo of lumber, the charterer is entitled to recover as damages the profits he lost on a resale of the lumber, where the vessel's agent, at the time the charter was signed, knew that the lumber was to be shipped for such resale.

7. **Shipping ⊂⊃58(3)—Owner liable for loss of profits on contract for resale of cargo, closed after charter signed.**

The charterer is not precluded from recovering from the vessel, which failed to carry a full load, his profits on a resale of the cargo, by the fact that his contract for resale was not closed until the day after the charter was signed, and the details were not communicated to the vessel's agent, where the fact that the ship was chartered to carry a cargo for such resale was generally communicated.

8. **Shipping ⊂⊃58(3)—Price at which lumber for cargo was purchased governs damages for failure to carry.**

In figuring the loss of profits from resale of lumber, due to breach of charter to carry, the price at which the lumber was purchased for that cargo controls, though the market price at the place of shipment was greater at the time the vessel sailed.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

267 F.—56

**9. Shipping ☞58(3)—Charterer can recover damages for which he is liable on resale, known to owner.**

Where a vessel's agent knew that the vessel was chartered to carry a cargo of lumber to fulfill a contract, the charterer can recover from the vessel the amount of his liability to his buyer for breach of contract of sale.

**10. Shipping ☞58(3)—Compensation for damages in foreign currency should be awarded in United States currency at going rates.**

On a libel to recover the damages for which the charterer was liable, because of the ship's failure to carry the full amount sold, which damages were stated in foreign currency, the charterer can recover an amount in United States currency which, at the rate of exchange on the day of entry of decree, would be sufficient to pay the damages in the foreign currency.

In Admiralty. Libel by the Pacific Export Lumber Company against the Japanese steamer Saigon Maru, claimed by the Osaka Shosen Kaisha. Decree rendered for libelant.

Wood, Montague & Matthiessen, of Portland, Or., for libelant.
Huffer & Hayden, of Tacoma, Wash., for respondent and claimant.

WOLVERTON, District Judge. This is a libel, instituted by the Pacific Export Lumber Company against the Japanese steamer Saigon Maru, to recover damages alleged to have been sustained by the libelant by reason of the vessel's having refused to carry a full deck load of sawn lumber, which it had by charter party contracted to do.

On or about March 19, 1917, libelant and claimant, Osaka Shosen Kaisha, entered into a charter party, whereby libelant chartered the Saigon Maru to carry a full cargo of lumber or timber, including a full deck load, from a port on the Columbia or the Willamette river to Bombay, India. Pursuant to the charter party, the steamer came to Portland, and here received on board a full cargo of lumber within her hold, and 241,559 feet, board measure, on her deck, but refused to take any further amount.

The libelant, claiming that the vessel could safely carry on deck on her voyage 750,000 feet, and was about to depart without taking on the full cargo which she had contracted to carry, instituted this libel to recover the damages which libelant would sustain by reason of such default on the part of the ship. Libelant bases its damages upon loss of profits on its sale of lumber to lumber merchants in Bombay, that is to say, upon the portion sold and not delivered, and its liability to such lumber merchants for failure to deliver to them the amount contracted to be delivered at Bombay, relying upon the due fulfillment of the charter party on the part of the ship, for transportation of the lumber to that port, as agreed. Among other things, it is alleged that libelant had sold the cargo of lumber to be carried to Gillanders, Arbuthnot & Co., Bombay; the amount being 5,500 tons, 10 per cent. more or less, so that the minimum quantity to be delivered under the contract was 4,950 tons; that the owners and agents of the Saigon Maru knew, when they chartered her to libelant, that libelant had sold the cargo in Bombay, and was chartering the vessel for the express purpose of transporting such cargo to Bombay, and that a certain portion of said cargo would consist of timbers of long lengths.

[1] The vessel having agreed to carry a full cargo of lumber, including a full deck load, the question to be settled is whether she was of sufficient capacity to carry safely the amount on deck that libelant claims she should have carried, or any greater amount than she did carry, having in view the voyage which she undertook to make.

The Saigon Maru is a tramp steamer, in length 354 feet, breadth of beam 50.3, and depth of hold 28.2, with gross tonnage of 4,354, and net 2,740. The route of the voyage took the vessel through the North Pacific Ocean to Nagasaki, Japan, thence through the Strait of Formosa and the China Sea to Singapore, thence through the Strait of Malacca, by Achin Head, and through the Indian Ocean, up the coast by Colombo, and thence on to Bombay. The vessel left Portland June 5th, and arrived at Nagasaki July 2, at 2:30 p. m. She proceeded on her voyage July 4th, at 5 a. m., and arrived at Singapore July 17th, at 2:15 p. m. She weighed anchor at 5:30, and proceeded on to Bombay, arriving there at 12:50 p. m. August 2d. Her voyage took her through the North Pacific at the quiet season of the year, when rough seas were not to be expected, through the China Sea at a season when typhoons were to be expected, and through the Indian Ocean in the monsoon season. The voyage, however, was made without incident, or the encountering of unusual stress of weather anywhere on the route; the log indicating at the worst, "Sea rather rough," with a wind velocity of from 4 to 5.

The libelant produced, in support of its contention that the vessel did not take on a full deck load of lumber, Captains Emile C. Genereaux, Andrew Hoben, and W. C. McNaught, all marine surveyors of long experience in that line, as well as upon the sea in various capacities. All these men were present while the ship was taking on her cargo, and made a survey of her as to her seaworthiness. Genereaux and Hoben were of the opinion that she could have safely carried 700,000 feet of lumber on deck. The former seemed to have no doubt of it, while the latter was more conservative, but nevertheless rather firm in his view that such a load would not have endangered her navigation on the voyage. Capt. McNaught said:

"I considered, owing to the dimensions of the ship, that she ought not to have had less than 600,000 feet of lumber, not less, and then not been near to her marks, and had plenty of stability; possibly 700,000, I wouldn't say, but not less than 600,000 feet of lumber, * * * minimum deck load for ship of that size and dimensions."

These men were handicapped in determining what the stability of the vessel would have been with such a deck load upon her, for the reason that the captain of the vessel positively refused to permit any more lumber to be put aboard than the deck load with which she went to sea, nor would he allow any of the usual tests to be made to determine the vessel's stability as the loading continued.

Henry Rothschild, president and manager of Brown & McCabe, stevedores, who had loaded many lumber cargoes for all parts of the world, was of the view that the Saigon Maru should have carried 400,000 or 500,000 feet more in her deck load, "compared," as he says, "with other vessels that we have loaded."

Mr. W. D. Wheelwright, president of the libelant company, who has had long experience in shipping lumber to the Orient and the west coast of South America, and elsewhere, was of the opinion that the Saigon Maru should have carried, at that season of the year, a minimum deck load of 750,000 feet. He also gives a list of four vessels, of similar dimensions to the Saigon Maru, which carried deck loads ranging from 620,175 to 854,308 feet, being an average of 743,587 feet.

The stanchions were first put in, of sufficient length to accommodate the larger deck load. The captain directed these to be sawed off to suit the load which he had made up his mind to take. It should be observed in this connection that Capt. Hoben and Capt. McNaught, and perhaps Genereaux, had had large experience as seamen in the China Sea and the Indian Ocean, and, of course, had in mind the vessel's intended voyage. Capt. McNaught, in speaking of these seas for the months of June, July, and August, was of the view that they were not worse than numerous other parts of the oceans of the world, or that the storms are much more frequent.

Besides the cargo of lumber, the vessel carried 500 tons of coal on deck, 200 tons between decks, and somewhat over 500 tons in her hold. To be more particular, she left port with from 1,210 to 1,220 tons aboard. Her trimming tanks were all full; also her fresh-water tanks, except one small one, of 18 tons capacity, which was partially filled. These tanks have a capacity of 901 tons.

The captain's reasons for not taking more cargo on deck were two, namely: That the terrible seas through which he had to navigate would not permit of it, and that a higher deck load was liable to interfere with his steering rods, and thereby endanger the ship and cargo. The steering rods are carried, one on either side of the ship, on iron stanchions extended "approximately 3 feet 6 inches above the bulwark" rail, and strengthened by stays, some running from the bulwark rail and some from the deck, which the captain describes as very strong. The bulwark rail is about 4 feet in height. These steering rods, as described by the captain, run about 2 inches outside the lumber stanchions, being timbers 6x12 to 8x12, by which the deck load was secured to the ship. The witnesses for libelant place the rods at a greater distance. For instance, Genereaux says that, "if the deck load had been continued, it could have been keep 2 feet away from the steering rods without any trouble whatsoever." Cullum thought the sag would be anything up to 4 inches or over.

The danger which Capt. Yamamoto seemed to fear was from the sag in the load which might be produced by the wind and the sea constantly breaking against the ship; but the surveyors were sure that the load could and would have been so constructed and secured as to obviate any danger from sag that would affect the steering rods. A deck load of 700,000 to 750,000 feet would, according to Genereaux, have carried it up forward about 10 feet and aft about 8, and, of course, above the level of the steering rods. This witness also relates that, about a month previous to the loading of the Saigon Maru, there was loaded in this port the steamer Luckenbach, "with 11-foot deck load, with similar arrangement of steering rod as the Saigon Maru." The

deck cargo, as loaded, was 6 feet high forward and 4 feet aft. A sag, as the witnesses all agree, is not a shifting or a spreading of the load, but a settling to one side or the other, as a ship may be said to sag by the forces or stresses it encounters at sea.

Without attempting to discuss further the evidence bearing upon the objection to carrying a larger deck load because of the arrangement of the steering rods, I am firmly persuaded, from a careful survey of the whole testimony, that it is without potency or force. Now, as it pertains further to the loading of the ship, Capt. Yamamoto has been long on the sea, much of the time as captain, and had served 1 year and 7 months as master of the Saigon Maru. Describing the southwest monsoon in the Indian Ocean, he says it continues for about 5 months in the year, from June to October; that his course from Colombo to Bombay is generally northwest, and that the sea attacks his steamer from port beam.

"Generally," he proceeds, "on that ocean the strong southwest wind blows continuously, and blows with violent and vehement waves and high swell, at that season. Sometimes the wind in that season might be quiet, but generally it is continuously blowing hard, with much rain, continuous rain. It is called the rainy season." The swell "causes the rolling of the vessel, and that is most dangerous to the ship. * * * Of course there is a difference according to the wind and waves, but it rolls violently and tremendously. * * * Comparatively speaking, the wind is not so high. I might indicate that by the numbers 6 to 7. * * * The sea swell is harder than the power of the wind. Generally the wind and sea come together in the same degree, but on the Indian Ocean the sea swell is harder comparatively than the wind. * * * Continuously on the voyage the dashing of the waves is up on the deck."

Mr. Cullum describes a little more fully in this respect. He says, speaking of a ship the size of the Saigon Maru:

"Well, I doubt if the seas would come along and hit the lumber, you know. The spray would go all over it certainly. I don't say the seas would go over it. If it hit the lumber, the spray would go over it; yes. The sea would hit the lumber on the side. I dare say there would be squalls come along that the sea would go over her, but not all the time."

Describing the typhoon of the China Sea, Capt. Yamamoto goes on to say:

"I met with a typhoon on the China Sea very often. * * * With or without deck cargo, it is the same when the vessel meets the strong typhoon; it would not avoid a wrecking of the ship. I will correct my answer. With or without the deck cargo it is the same for any vessel which encounters the strong typhoon in that season, which might result in the wreck of the ship; that is, it may occur, because the typhoon is strong (if it is in the center of the typhoon); and I wish to emphasize the danger to the ship in such a season with a heavy deck load."

He says, further, that these typhoons occur about every 2 or 3 days in July, referring to "all kinds" of typhoons, "sometimes bad, sometimes not so dangerous, sometimes very dangerous." Being asked, "And how often do you expect to meet a terrible typhoon in July?" he answered, "That may be three or four times." He has taken voyages through the China Sea "very often"; six with the Saigon Maru, aside from the one from this port. Some of them were in the stormy season.

Witness relates that he met with a typhoon perhaps twice, but not heavy, and a strong southwest gale. He further relates that ships never carry deck loads from Japan to Singapore during the typhoon season. In this general statement he is corroborated, in the main, by Yamaguchi, and in some respects by Cullum. Being asked as to what he thought was a reasonably safe cargo for the Saigon Maru to carry on deck, with her hold full of lumber, the witness answered: "I think about 300 or 330 tons; something more than 300 tons on deck." Further, he states that the reasonable G. M. of a vessel like the Saigon Maru, carrying cargo, is "from one foot to two feet." This means the distance between the center of gravity and the metacenter.

Mr. Yamaguchi, who had had large experience as captain and master of a vessel, was asked to give his opinion as to what amount of cargo the Saigon Maru should have carried on her deck, and in effect answered that, with the bottom weight 150 tons heavier than the deck load, "that means both bunker coal and cargo, so that if bottom weight or water in tanks is 883 tons minus 150 tons, making 733 tons for the weight on deck, in the best condition; * * * deducting the bunker coal, 500 tons, the deck load would be 233 tons in weight." This on the basis that the ballast tanks were full, and the ship had 2,436,800 feet of lumber in her hold. He said, further, that he thought the maximum amount of cargo that could have been carried on deck was 383 tons, but that such an amount on deck would have made the ship a little tender.

Yamamoto further relates that an experiment was made at Nagasaki to ascertain the G. M., and it was found to be 1.36, with the coal and lumber cargo the same as at Portland, but with 150 tons less water in her fresh-water tanks. An estimate has been made from this basis, by Capt. Okuda, that the G. M. at Portland would decrease in proportion to the increases of the deck load, as follows: With 700,000 feet deck load, the G. M. would be .57; 600,000 feet, .83; 500,000 feet, 1.07; 400,000 feet, 1.09 (this should probably be increased by at least .20); 300,000 feet, 1.53; 241,000 feet, 1.67.

It is further in evidence that the ship's G. M. would increase for the first eight days of her voyage, by the consumption of her coal and fresh water from her tanks. From then on to Nagasaki, according to the estimate from her G. M. at Nagasaki, she would become more tender. The estimate of her consumption of coal was about 32 tons per day—from 30 to 32 tons. She took on 1,050 tons at Nagasaki, and then had on board for her further voyage 1,300 tons. This would indicate that she consumed about 950 tons between Portland and Nagasaki, or about 37 tons per day of her 26 days' voyage. This discrepancy has not been explained. It furthermore appears that, when the vessel reached Bombay, she had on board 500 tons of coal, making her consumption less on a distance of about 200 miles greater than from Portland to Nagasaki. It is to be remembered that her voyage between the latter ports was through comparatively smooth seas, and without unusual incident, and the consumption of coal should at least have been no greater than from Nagasaki to Bombay.

[2] But, to a consideration of the question whether Capt. Yamamoto

should have carried a larger deck load: He stated plainly that he would not have carried more than he did, regardless of the condition of the steering rods, because he seemed to think that it would affect the stability of his ship. He is a seaman of large experience, and much weight must be attached to his honest and sincere judgment as to the peculiarities of his ship and its capacity to carry deck loads upon a projected voyage, and we must not overlook this feature attending the controversy. The Addison E. Bullard (D. C.) 252 Fed. 241; Weston et al. v. Foster et al., 29 Fed. Cas. 804, No. 17,452. He had, however, scarcely any practical experience in navigating ships with deck loads of lumber cargo. As to the anticipated typhoons and his dread of the monsoon, I am impelled to the view that he has very greatly exaggerated their terror to seamen. His own experience has called him upon many voyages through the China Sea, and frequently into the Indian Ocean, yet he relates but one or two incidents when he has encountered a typhoon, while he has more frequently encountered gales resulting from cyclonic conditions; but he has never met with any serious mishap. Furthermore, the mariner, perhaps universally, has 24 hours' notice of the coming of a typhoon, and is enabled thereby to avoid its disastrous effects. He may of necessity encounter at times the heavy seas and storms that result from the cyclonic conditions, but rarely the central disturbance that is so fatal to navigation. These resulting disturbances are perhaps no greater, nor more to be dreaded, than the seas elsewhere, where navigation is constantly under way.

As to the monsoon, it would seem to be not so perilous as Yamamoto was constrained to believe. It consists of a steady southwesterly wind, only occasionally of violent proportions, which continues for a considerable time, and blows up what is termed a "short chop" of sea swell. The monsoon is encountered only after passing Achin Head, from which point it is a 13 days' voyage to Bombay. From Achin Head to Colombo the course is mainly west, and the southwest breeze strikes the ship on its port bow. From Colombo to Bombay, the sea is on the ship's beam, or port quarter. Yamamoto's apprehension as to this sea was that it would cause a sag in the deck load, which might prove injurious to the ship and cargo. By the time, however, the vessel arrived at this last lap of the voyage, the deck load would have so settled and been drawn together by its lashings that a sag could hardly be expected in such proportions as to give trouble.

[3] Turning to the G. M., Okuda's estimate gives the G. M. in Portland, on a deck load of 500,000 feet, as 1.07. This would be reduced, as the voyage proceeded to Nagasaki, by the consumption of water and coal from the lower hold, so that it would fall below 1 foot, and thus make the ship too tender, or unstable. In this relation, however, there is another condition to be considered. The coal required to carry the vessel to Nagasaki was 832 tons plus 25 per cent. to meet emergencies, making a total of 1,040 tons. The ship carried from 1,210 to 1,220 tons, an excess of from 170 to 180 tons. That amount in tonnage of lumber could have been carried on deck in place of the coal. Furthermore, Yamaguchi was of the opinion that the vessel could have carried 60 tons more on deck than she did carry. This would make a

very substantial addition to the deck load. The vessel cannot carry a quantity of coal for its own purposes, other than as fuel for the voyage, and thus deprive the charterer of space to which he is entitled. Darling & Son v. Raeburn, 10 Aspinall (N. S.) 268, on appeal 429.

As to the water ballast, it is obvious that, while it seemed to be necessary to carry the trimming tanks full on account of their construction, to prevent the water from flowing from one side of the ship to the other, and thus add to the stability of the ship in navigation, No. 3 of the fresh-water tanks could have been filled at sea, to give more ballast if needed; that is, if it was found the ship was becoming too tender.

It is impossible, from the meager testimony that we have as to the ship's G. M., and the doubtful reliability of the deductions made from the G. M. ascertained at Nagasaki, considering the varying conditions of the ship's load, satisfactorily to determine from the G. M. basis the amount the ship could safely carry on deck. The testimony is of real value, however, as indicating a range of probability respecting the amount of deck cargo above which it would be unsafe for a ship to venture on the seas. Considered along with the testimony of the surveyors and other witnesses of experience in loading vessels, I am drawn irresistibly to the conclusion that, by proper loading, the Saigon Maru could have carried 550,000 feet of lumber on her deck, with reasonable safety, in view of the voyage contemplated. There was, undoubtedly, no ulterior motive impelling the captain to refuse to take on board a larger deck load, but obviously he was unduly timid, and committed an error in judgment, all in good faith on his part. See, in support of this conclusion, The Helios (D. C.) 108 Fed. 279, 284.

This brings us to a consideration of the liability of the vessel, if liable at all, for the damages the libelant has sustained. By the charter party the owner of the steamer Saigon Maru, or the steamer, we may say, agrees on the chartering of the whole of the vessel, including the deck, with certain exceptions not essential to the inquiry. The charter party was brought about through certain correspondence and conferences had between the libelant and the representative of the ship, namely, Edwin Orrett, local manager at Tacoma. The first inquiry was by Orrett of the libelant, touching whether there were any offers of lumber for Bombay. Libelant replied that it had an offer from friends in Bombay for a full cargo of Oregon pine lumber, not to exceed 4,500,000 feet, cargo to be furnished according to an inclosed schedule called "Adneci," and giving somewhat the proposed terms of loading, discharging, demurrage, etc. On March 13, 1917, Orrett advised that he had a cable from claimant that the Saigon Maru would be available for full load for April or May loading. Libelant answered on the same date, March 13th, and, after stating some conditions that would be agreeable to it, closed by saying:

"We are cabling Bombay, so as to be in position to close on receipt of your reply."

A day or two later—the date is not given—libelant wrote to Orrett:

"We have your telegram of to-day, and inclose copies of our two messages of this date to you; hoping that you and we may both receive cables to-morrow

from Japan and Bombay, respectively, that will enable us to close this matter up; so we hand you herewith a form of charter party into which should be filled, on lines 4 and 5, the location and the prospective voyage of the steamer, and on lines 83 and 84 the canceling date and the date when lay days are to begin."

On the 15th libelant telegraphed Orrett waiving "condition re extra insurance on deck; still awaiting reply from Bombay"; and on the 17th libelant telegraphed. "We accept Saigon on terms of charter party mailed 13th," noting some change of conditions suggested therein. Mr. Wheelwright states that the telegram was sent at 10 o'clock a. m., and closed everything except the conditions about lay days for discharging. Libelant wrote Orrett, also, on the 17th, confirming the telegram of acceptance. On the 19th Orrett wrote, returning the form of charter party, and indicating that the specification submitted was satisfactory; also advising that the ship would be found to be a fair lumber carrier, and requesting libelant to make up a charter party incorporating the conditions set forth in his letter. Libelant replied on the 20th, inclosing eight signed copies of the charter party for the signature of the local manager.

The negotiations leading up to the sale of the lumber by libelant to Gillanders, Arbuthnot & Co. began with a letter from that company, of date December 14, 1916, inclosing a schedule of 4,500,000 feet of lumber. The next step was a cable by libelant to them, of date March 3, 1917, saying:

"We think there is good prospect 7,500 loads of 50 cubic feet, 180 shillings per load basis c. i. f. per steamer Bombay March-April-May shipment."

Gillanders cabled March 10th:

"We give you firm offer as per your telegram of March 3, 7,500 loads of 50 cubic feet. * * * 180 shillings per load including war risk."

The price named is the one at which the parties finally closed. On the 12th libelant telegraphed Gillanders:

"Working. Understand 180 per load basis offer to stand good until advised to the contrary."

On the 13th libelant again cabled:

"Think can accept subject your approving charter Saigon Maru, estimated 3,300,000, Osaka Shosen Kaisha represent making April-May clearance; freight prepaid; option substitute another at least equally near loading port, not exceeding four and a half millions. Confirm quickly."

Gillanders cabled on the 17th:

"As per your telegram of 14th March we confirm the offer to stand good until advised to the contrary. Do your utmost to make maximum quantity 6,000 loads of 50 cubic feet."

On the same day they telegraphed again:

"Referring to your telegram of 14th we cannot consider terms of charter. Our offer is (stating it). On this understanding we agree to 5,500 tons, 3,300 thousand feet, but we cannot agree option of another steamer unless similar quantity."

The reference to telegram of 14th is to the above telegram sent to Gillanders of date the 13th. In this relation, Wheelwright testifies that he spoke to Orrett with reference to substituting another steamer up to 4,500,000, and that they did not favor it. On the same day, March 17th, at 5:40 p. m., libelant cabled:

"Your telegram to hand. We conform to contents. Expect close Saigon Maru estimated 5,500 loads of 50 cubic feet."

It was explained that "We conform to contents" means "We accept your offer." That was the contract finally with Gillanders, Arbuthnot & Co. All these cables were based on the Adneci schedule.

I have endeavored, by the references to the correspondence touching both relations, to give only so much as will fairly represent the trend of the negotiations, and the pertinent language essential to the present inquiry.

[4] The rule relating to damages attending a breach of contract is thus lucidly stated in Hadley v. Baxendale, 9 Exch. 341:

"Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally (i. e., according to the usual course of things), from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract."

Mr. Benjamin deduces the following rule from the English cases, where goods have been bought for resale, and there is no market in which the buyer can readily obtain them:

"If, at the time of making the contract, the seller knows that the buyer buys the goods with the intention and for the purpose of reselling them, although he may or may not know of any particular subcontract existing or contemplated, the inference is that the seller contracts to be liable for the increased damages which will flow from a breach of the contract under the special circumstances; and, applying the second part of the rule laid down in Hadley v. Baxendale, those damages may readily be supposed to be within the contemplation of the parties."

The American doctrine is substantially the same, and is thus stated in Hockersmith v. Hanley, 29 Or. 27, 38, 44 Pac. 497, 500:

"A person injured by the breach of a contract to which he has become a party with another is entitled, upon principle, to recover damages commensurate with the injury he has sustained, and this will include gains prevented as well as losses sustained. They must be such, however, as naturally result from the breach, or may reasonably be considered to have been in the minds of the parties at the time of entering into the contract; the contract itself being, impliedly at least, formulated with reference thereto in the event of a violation

cf its conditions. The intention of the parties is to be ascertained from a consideration of the contract taken in connection with the surrounding circumstances and conditions of which they are cognizant; and if the circumstances and conditions are such as to make it apparent that the contract was entered into and known by the contracting parties to have been consummated to enable one of them to serve or accomplish a particular purpose, the liability of the other for its violation will be determined and the damages ascertained with reference to the effect of the breach in hindering or defeating the contemplated object. They must also be certain, and flow directly and naturally from the breach; or, to put it in another way, they must not be the remote but the proximate consequence thereof, and not speculative or contingent."

Numerous cases are cited in support of the text. Among them see Cockburn et al. v. Ashland Lumber Co., 54 Wis. 619, 12 N. W. 49. As relating to a contract to carry, see, further, Cobb, Blasdel & Co. v. I. C. R. R. Co., 38 Iowa, 601.

The principle of just compensation is paramount, which means that it shall be commensurate with the loss or injury sustained, and, of course, not in excess thereof. 1 Sutherland on Damages, 47, 48. Further discussing the law of damages, the learned author says (page 203):

"Damages are not the primary purpose of contracts, but are given by law in place of and as a compensation and equivalent for something else which had been agreed to be done and has not been done. What the damages would ordinarily be on such a default is immaterial, if the contracting party assumed the obligation he has broken with a knowledge of a peculiar state of facts connected with the contract which indicated that other damages would result from a breach, and the latter are claimed. To confine the injured party's recovery in such case to the lighter damages which usually follow such a breach, where no such known special facts exist, and exclude those which were thus brought within the contemplation of the parties, would be to sacrifice substantial rights to arbitrary rule, to set aside the principle which entitles a party to compensation commensurate with his injury to give effect to a rule formulated to render that principle effectual; it would be to apply a subordinate rule where it has no application, instead of the principle, which is paramount and always applicable. What are the usual damages which result from the breach of a contract? There is certainly no customary amount, nor is there any rule of damages which is universal like the principle for allowance of due compensation. If it is a contract of sale, and the vendor refuses to complete it, one rule is to ascertain that compensation by the difference between the contract price and the market value, because if the article which is the subject of the contract can be obtained in market at a market price the vendee is thereby enabled to supply himself without loss unless the price has increased. That rule goes no further, but the principle does. Where the vendee cannot obtain the article in the market, nor at all if the vendor refuses to perform his contract, that rule is not applicable, and then resort must be had to other elements of value, and recourse is had to the principle to determine the measure of redress; even a contract of resale made by the vendee and of which the vendor had no notice may be considered."

See, also, Strom Bruks Aktie Bolag v. Hutchison, 10 Aspinall, 138, 140, 141.

The general rule respecting the measure of damages, on refusal to perform a contract for transportation, is:

"The difference between the market value at the destination when the goods should have arrived, if carried in accordance with the contract, and the value at the same time at the point of shipment, less what it would have cost the shipper under the contract to have had the goods transported; that is, freight charges and other necessary expenses." 6 Cyc. 525.

[5] This, like all general rules, however, is inapplicable in exceptional cases. It is a feature in the present case that, owing to war conditions, libelant was practically unable,.at the time of default, to procure transportation to carry to Bombay the lumber left behind. If it could have been procured at all, it would have been at very greatly increased cost, and, if libelant had resorted to that means of invoking the general rule, the claimant would have suffered beyond what would seem to be reasonable damages.

[6] The facts disclose that claimant had practical knowledge that libelant was negotiating for a sale of the cargo, or at least a part of it, in Bombay, when negotiations for the charter party were under way. Orrett was advised at the very outset that libelant had an offer from friends in Bombay for a full cargo, not to exceed 4,500,000 feet, of lumber. Later, as the negotiations proceeded, Orrett was advised by libelant that it was "cabling Bombay so as to be in position to close on receipt of your [Orrett's] reply." Still later libelant expressed to Orrett a hope that—

"We may both receive cables to-morrow from Japan and Bombay, respectively, that will enable us to close this matter up."

And then on the 15th of March Orrett was advised that libelant was "still awaiting reply from Bombay." The contract with Gillanders, Arbuthnot & Co. was closed on the 17th by cable, dispatched at the hour of 5:30 p. m., and the negotiations with Orrett for the charter party were closed on the same day by dispatch forwarded at the hour of 10 a. m.

[7] It cannot alter the case that libelant closed 'with claimant a few hours previous to closing with correspondents at Bombay. The fact remains that claimant had full knowledge of libelant's purpose in securing the charter party, and entered into the charter party with a view of enabling libelant to further, and even to consummate, that purpose. Nor was it essential, under the authorities, that claimant should have been advised of the exact conditions of the contract of sale to Gillanders, Arbuthnot & Co. It was sufficient that it had knowledge of the fact that such a sale was in contemplation, dependent upon securing the charter party.

[8] The damage claimed under the first head is the loss of profits libelant sustained in not being able to deliver, under its contract, the cargo left at home to Gillanders, Arbuthnot & Co. at Bombay. The loss sustained was at the rate of $7.955 per 1,000. I take this from Mr. Wheelwright's statement, which stands uncontradicted. The amount of lumber which claimant failed to carry that it should have carried is 308,441 feet, making the damages $2,453.65. This seems a fair adjustment under the conditions prevailing.

Objection is made that libelant purchased the lumber in this port in March at a much lower figure than could have been procured in June, when the vessel sailed, or on August 2d, when the cargo arrived at Bombay. But it is a sufficient answer to this that the lumber was purchased for the Saigon Maru's cargo, and the rate of loss named was the actual damage sustained by the claimant's failure to carry. Such

are the damages that were legally in the contemplation of the parties when the charter party was entered into.

[9] The damage claimed under the second head is the amount claimed by Gillanders, Arbuthnot & Co. against libelant for a failure to deliver the lumber left at Portland. Libelant has not as yet paid these damages, but the same have been liquidated, and there can be no question as to libelant's liability to pay them. These damages have been ascertained at Bombay—one item of £1,075 sterling, and another of 4,550 rupees. These are the damages for which claimant, or rather the Saigon Maru, is liable to libelant under the second head.

[10] As libelant is enabled to discharge these damages in the money of the realm where payable, the decree should be for the amount, in money of the United States, that will enable libelant to discharge such liability at this date, being the date of the entry of the decree. As the court is not advised as to the present rate of exchange of pounds sterling or the rupee, the adjustment will be made on counsel's furnishing the necessary information. These last items of damages, as is obvious, are not so direct as the first; but it is apparent that they come within the general principles governing, as above ascertained.

The English statute alluded to in the evidence and argument can have no bearing on the present issues, especially as it has been repealed. I have reviewed the authorities presented on exceptions to the libel, and now again insisted upon, whereby the sufficiency of the libel is challenged, but am constrained to adhere to my former ruling.

The claims for damages as here ascertained will bear interest at the lawful rate of 6 per cent. per annum from August 2, 1917, and libelant will recover its proper costs and disbursements.