## THE STARLIGHT.

### MENEFEE et al. v. THE STARLIGHT.

(Circuit Court, N. D. Florida. March 28, 1890.)

SHIPPING—CHARTER-PARTY—ACTION FOR BREACH.

    Under a charter-party providing that the ship should carry "a full cargo of timber, * * * not exceeding what she can reasonably stow and carry over and above her cabin, crew, and fuel spaces, * * * the entire carrying capacity * * * to be at the disposal of the charterers; * * * charterers to have privilege of shipping a deck-load of timber, provided surveyor permits," the charterers are entitled to damages for refusal to carry a deck-load, those acting as surveyors agreeing that the ship was able, when the master uses the deck to carry coal for the voyage, and there is no evidence of any custom allowing it.

In Admiralty. On appeal from district court.
*John C. Avery*, for libelants.
*Blount & Blount*, for claimants.

PARDEE, J. In July, 1888, the owners of the steam-ship Starlight, then at New Orleans, through their duly-authorized agents, entered into a charter-party with the libelants for a voyage from Pensacola, Fla., to Liverpool, England, to carry for charterers a full and complete cargo of timber for the lump sum of £1,750. The charter-party provided that the ship should carry "a full and complete cargo, to consist of sawn timber and / or deals, and / or boards, at merchants' option, * * * not exceeding what she can reasonably stow and carry over and above her cabin, crew, and fuel spaces, tackle, apparel, provisions, and furniture; * * * that the entire carrying capacity of the steamer, including all spaces in which steamer may previously have carried cargo, to be at the disposal of the charterers. * * * Charterers to have privilege of shipping a deck-load of timber, provided surveyor permits." Further, the charter provided that, if the vessel should take 1,500 loads cargo or more, the charterers would pay a further sum of £50, or in all a lump sum of £1,800; and authorizing the ship to call at any port or ports for coal and other supplies. When the ship reported at Pensacola her decks were covered with coal said to be required for the voyage to Liverpool. The master, however, stated at the quarantine station, when asked why he had his coal on deck, that it was because he did not intend to take any deck-load. The charterers requested him to remove the coal, so as

to allow of a deck-load; and, in default of removing it entirely, to so stow it as to occupy the least compass, and enable the charterers to use the balance of the deck for a load,—all of which was declined by the master. The surveyors of the port, consisting of port-wardens and pilot commissioners, etc., (there was no certain officer designated as surveyor,) agreed, in the main, that the ship could safely carry a deck-load; in fact, there was no dispute as to this proposition, because the master of the vessel proposed to and did carry a deck-load of coal. During the loading of the ship, one of the hatchways was stowed with timber, but the master required the stevedore to take this out, and throw it overboard, and refused to permit the use of the hatchways for the stowage of cargo. When the vessel was loaded with about 1,250 loads of timber, she was declared full, and could stow no more. The evidence is conflicting with regard to the number of additional loads that the ship would and could have carried, had the deck space and hatchways been utilized for cargo. The weight of the evidence, as found by the district judge, was in favor of libelants, and to the effect that she could have carried 205 additional loads. In the preliminary correspondence, by letter and cable, between the agents of the respective parties, as to the chartering of the Starlight, there were representations made that the ship would coal at New Orleans,—whether for the voyage was not mentioned; but no correspondence was had with reference to reserving any other than fuel spaces for stowage of coal, and nothing was said as to reserving any part of the deck space for any such purpose. There is some evidence in the record tending to show that ships in the lumber trade from Pensacola sometimes load with coal for the entire voyage, and sometimes stop at Newport News or Norfolk to coal en route. No custom or usage in regard to this coaling matter, however, is proved in the case; neither is any custom or usage proved with regard to stowing fuel on deck. It is a fair presumption, from the terms of the charter-party providing for an additional lump sum, if the ship would carry over 1,500 loads, that the ship was held out (not warranted) as able to carry on the voyage in the neighborhood of 1,500 loads, and that the lump sum for freight was fixed with reference to such capacity. The contract does provide that all the cargo spaces of the ship, including the deck, in a contingency provided for, should be used for cargo. This agreement was violated, to the damage of the charterers. The libel is brought in this case to recover the amount of such damage. On the showing made, the libelants are entitled to recover. The evidence being to a great extent conflicting, with a preponderance in favor of the libelants as to 205 loads of deficiency, and that amount having been found by the district court, I am indisposed to disturb it; particularly as, from the evidence running through the transcript, not necessary to recapitulate, the violation of the charter-party, by reducing and cutting down cargo space, was intended by the master, probably, for the purpose of saving expense of coaling en route, and of making a quicker voyage, to the advantage of owners. A decree will be entered to the same effect as that rendered in the district court, with costs.