## THE HELIOS

### (District Court, E. D. New York. April 16, 1901.)

1. SHIPPING—BREACH OF CHARTER—LIABILITY OF VESSEL.

Libelant, a wrecking company, chartered a steamer to be used in salving the cargo of a vessel which had been wrecked in the West Indies. The locality and the nature of the work were known to the owner, and the charter gave libelant the use of the vessel for about six weeks. When the salvage had been but partially completed, and before the expiration of the time limited, the master refused to stay longer, alleging the insufficiency of the anchorage, and his fear of storms. The proofs showed that storms were not usual at that season, that the weather had been at all times pleasant, and that the vessel was not in any great or unusual danger by reason of the nature of the anchorage. *Held*, that under such facts the refusal of the master to remain was a breach of the charter, which rendered the vessel liable for the damages sustained by libelant from the forced abandonment of the work.

2. SAME—CONSTRUCTION OF CHARTER—LENGTH OF TERM.

A charter of a steamer for a wrecking expedition limited the term to "about six weeks," which was the time the charterer estimated would be required. *Held*, that such charter could not be construed as one for such time as might be required to complete the enterprise, or to entitle the charterer to retain the vessel for a term longer than eight weeks.

In Admiralty. Suit in rem to recover damages for breach of charter.

Benedict & Benedict (E. G. Benedict, of counsel), for libelant.
Wheeler & Cortis (Everett P. Wheeler, of counsel), for claimant.

THOMAS, District Judge. Hogsty Reef is a coral formation in the West Indies. Its shape is that of a horseshoe, some 4 miles in length from west to east. Its greatest width is 2½ or 3 miles, and the entrance is at the western end, between two sandy keys, from a half mile to a mile apart, rising 10 feet or more above the water, and forming the calks of the shoe. The circle of the reef is in greater part submerged, but over it the water is carried, under the influence of sufficient wind, without immoderate or injurious disturbance of the interior water. The tide rises about 1½ to 2 feet, is deficient in strength, and subordinated to the light counter winds usually prevailing in June and July. The water varies in depth from 5½ to 6 fathoms at the entrance to 3½ fathoms proceeding to the eastward for a distance of 2 or 3 miles. The interior water is clear, and objects on the bottom can be seen usually for a cable's length or more. The bottom is coral, with here and there drifts of shifting sands, sometimes more than 2 feet in depth, with scattered coral projections, rising, relatively to the depth of the water, inconsiderable distances, from which, however, a channel of some 1,500 feet in width is free. The reef is in the trade winds, and at the times of the events herein discussed the prevailing winds were east, or varying to points north and south thereof. About three miles eastward of the entrance, and on the northeast side, and without the reef, the steamer Framnes was wrecked. The libelant made a contract with the underwriters representing the cargo, which consisted of about 1,400 tons of trolley railway iron and fixtures, for salving the same, whereby the libelant obtained rights of property in such cargo. This contract was concluded after the libelant had dispatched Mr. Hagerty, an expert wreckman, to examine the wreck and the cargo, and the opportunities and needed facilities for securing it. Thereupon libelant negotiated with Mr. Hvoslef for the charter of the steamship Helios, to whom was explained the contemplated use of the vessel, the depth of water found through the libelant's investigation, which was stated to be "from five to six fathoms at the entrance of the harbor for a width of about three-quarters of a mile, and that the soundings, continuing up in the harbor for a space of about three miles, were from three and a half to five fathoms." Mr. Hvoslef was also advised of the nature of the cargo, and of the proposed manner of salving it, which accorded with the course subsequently observed. Mr. Hvoslef claimed a general knowledge of the reef, but did not have nor claim a detailed knowledge thereof. He stated that the water, as represented, was sufficient for the Helios. Thereafter Hvoslef brought to libelant a prepared contract for chartering the Helios, and it was executed under the date of May 22, 1900. Upon the submission of the proposed charter to him, Mr. Merritt, libelant's treasurer, called attention to the clause limiting its continuance "for about six weeks, to the West Indies and back." Concerning this Mr. Hvoslef testified that he explained to Mr. Merritt, libelant's representative, that the Helios had to be back by a certain time, and specifically he testified as follows:

"Q. Isn't it the fact that the word 'about' was put in instead of saying 'voyage for six weeks,' 'round trip of six weeks'? You said 'about six weeks'

because it was understood by both you and Mr. Merritt that it was impossible to say just how long it was going to take to get that cargo out of that wreck? A. That is the reason we gave Mr. Merritt the benefit of the doubt,—'five days more or less.' We didn't state it. That is generally the impression. 'About' means 'five or ten days more or less.' Q. Is that the custom of the trade? A. That is the custom of the trade. * * * Q. The question is whether, under the charter party, with the explanation you gave of the custom of the trade, you gave him six weeks, with an addition of ten days in addition? A. Five or ten days more either way."

The witness further explained that the time would begin to run from the time of the delivery of the ship. The Helios arrived in New York May 22d, and actually sailed on June 1st, having been delivered May 30th at 12 noon. The Helios was 290 feet in length, 883 tons, carrying 2,300 tons cargo, and was flat-bottomed, and without keel. After the charter was executed, and before delivery of the vessel under it, her master, Capt. Salvesen, called upon Mr. Merritt at the latter's request, and there also met Mr. Hagerty, the wreckman, and received information similar to that furnished to Hvoslef. The following day, and a day or so before sailing, the master returned, and stated that after considering the matter and nature of the work, and the place of doing it, he could not allow the vessel to go unless the libelant assumed all responsibility for any damage or loss to his property and to the libelant's accompanying barge. This interview resulted in the libelant's signing the following letter:

"Bennett, Walsh & Co., Steamship Agents and Ship Brokers,
18 Broadway, New York.
"May 31, 1900.

"Capt. Salvesen and Owners of the S. S. Helios: Referring to charter party dated 22d of May, 1900, between W. D. Munson, chartered owner, and the Merritt & Chapman Derrick & Wrecking Co., in consideration of Capt. Salvesen agreeing to go to Hogsty Reef in order to assist in towing barges in and out of said harbor, and to assist in loading and unloading from such barges cargo from the Norwegian steamer Framnes stranded some time ago on said reef, and otherwise complying with our wishes, we hereby guaranty to hold the owners of this vessel free from any responsibility that may arise from this special work, and we also guaranty to repair all damages to the ship caused by the master complying with our demands to do said work, and, if the ship should be lost, or otherwise damaged, on account of doing this special work (always, of course, excepting the usual risks of navigation ordinarily covered by the owners), we hereby guaranty to cover owners for the vessel's full value, which is given to us as $90,000, and small damage as per estimate, if such damage should occur, caused by such work.
"Yours, truly, Merritt & Chapman D. & W. Co.
"I. J. Merritt, Jr., Treas."

Thereupon the libelant insured the Helios for $90,000. After sailing, the Helios took the barge with material and men from Norfolk, and arrived at the reef on June 10th. The work was carried on as follows: The Helios towed the barge to the vicinity of the wreck, and then returned to anchor, usually at a place between the keys. When the barge was sufficiently laden, a signal was displayed by the wreckers, and thereupon the Helios took the barge in tow, and brought her to the anchorage place, and the iron was transshipped. This operation continued until June 22d, at which time the Helios had received four barge loads of iron. Then the master of the Helios notified Hagerty that the reef did not furnish sufficiently safe anchor-

age ground to justify his remaining and incurring the hazard of dangerous weather, and, notwithstanding Hagerty's protest, the Helios, Hagerty accompanying, sailed on June 24th to Mole St. Nicholas, where a joint telegram was sent to the Merritt Company, as follows:

"962 rails on board. Will probably get 300 more. Captain considers too risky stay longer; no holding ground. Cable destination.
                                        "Hagerty Salvesen."

To this Hagerty received the following reply:

"Cargo destination Havana. Cable us when expect to arrive. Work must be carried on or abandoned per your judgment.                Merritt."

Thereupon the master of the Helios, against the expressed decision of Hagerty, declined to continue operations, and returned to the reef, took from the barge the iron secured during his absence, and departed on June 29th, arriving at Havana July 3d, where, after waiting for the underwriters' agent for about 12 days,—a delay occasioned by the unexpected termination of the enterprise,—the iron was discharged, and the steamship returned to New York, arriving on July 25th, after an absence of eight weeks. The cessation of operations and the time lost thereby interrupted the salving of the cargo. Whether all of the iron could have been secured need not be determined, but that some portion was lost by the Helios' departure is beyond question. What the amount was and the damage to the libelant therefor is a matter for the commissioner, provided the interruption of the operation was not justified. To this attention will now be given. Did the libelant acquiesce in, and thereby ratify, the cessation of the work? The decision was left to Hagerty, and he decided to stay, and his determination was known to the master of the Helios. The master would convey the impression that Hagerty assented to the suspension of the work. Hagerty's statement is easily preferred. The important defenses are: (1) That the libelant did not fulfill the eighth article of the charter, which is as follows: "The cargo or cargoes to be laden or discharged in any dock or at any wharf or place that the charterers or their agents may direct, provided the steamer can always safely lie afloat at any time of tide." (2) The respondents fulfilled the time limited in the charter, to wit, "for a round trip to West Indies of about (6) six weeks. Steamer to be placed at the disposal of the charterers at New York." Certain facts are obvious. From the time of the arrival of the Helios at the reef the tide was slight in its influence, the wind was usually gentle, and never immoderate, and in the very midst of temperate conditions of weather the captain of the Helios ended the work. Why? Because he said he feared hurricanes, or at least high, and, in view of the anchorage facilities, dangerous, winds. There were no premonitions of a hurricane or dangerous winds, although such winds do come without any considerable notice. They are short in duration, lasting sometimes half an hour, and come with short notice. There is no evidence that one came during the time that the Helios should have remained, but the evidence permits the contrary inference. Nor is there evidence of any winds that, in view of the undertaking assumed, should have so excited the apprehensions of a prudent navigator as to effect its.

termination. But it is urged that tempests and dangerous winds were expectable in June and July in that region. The evidence shows that such winds were exceptional during those months. But, in any case, the vessel was chartered for those very months, for those very waters, and that very reef. To this the final reply and objection is interposed that the vessel had not good anchorage grounds; that even the light winds that did prevail caused the anchor to drag; and that sudden squalls, even not of the degree of violence of a hurricane or gale, would have caused the anchor to drag, and, according to their direction, have carried the vessel on the reef, or out to sea. One difficulty in solving the controversy lies in the fact that the difficulties of the captain of the Helios were entirely subjective, save as they are illustrated by the evidence offered on the part of the claimant that the anchor dragged. The evidence shows that the anchor dragged when it was let go at a point some distance within the reef, where it caught shortly, but the vessel brought up near a black spot, or coral projection, covered by kelp or weeds, so that her bottom was not more than six inches above the same. The captain also claims that his vessel subsequently dragged both before and after Hagerty placed the buoy opposite her to determine whether she dragged, and to test the captain's statement respecting the same. There is no difficulty in reaching the conclusion that the captain is in error in stating that the vessel dragged after such buoy was placed, although the wind was stronger thereafter than at any previous time. There is great doubt whether she dragged at all at the entrance. Even if she did thus drag, there was apparently no serious danger therefrom, and nothing more disastrous than her drifting outside the reef is apparent. Good anchorage was found between the keys with sufficient depth of water, and plenty of room to swing, and at this place she remained during the entire stay, except upon the occasion when she went within the reef and anchored on the single occasion to which reference has been made. Had the winds that excited the prudence of the captain actually come, a catastrophe was possible; but it is difficult for a timid landsman to read the record, and seriously believe that the steamship would have done other than gone to sea if her anchor dragged, provided the persons in charge of her had been as vigilant and prepared as their duty demanded. She might have lost her anchor, but anchors in abundance were offered to the steamer by Hagerty, and were declined. But, if her anchor did drag on two occasions, the remaining time it held. It is not unusual for anchors to drag in a good harbor, but such happening does not condemn the harbor; and while there are undoubtedly better anchorage grounds than this reef, and while the smooth floor was unfavorable to holding, yet no special difficulty arose therefrom while the steamer anchored between the keys. When the owners chartered the vessel they knew that she must anchor, if at all, within the reef. They must have known that the floor of the reef was coral, and that the holding ground would be inferior to sand, mud, or clay. Moreover, for the greater part of the time the vessel was idle, and there was abundant opportunity to increase the means of holding, so that all difficulties could be overcome. Generally, she held. True, the winds were not

violent; but, with some duplication of her anchors, the resistance could have been sufficiently augmented, and in any case the probable results would have been the injury incident from going out to sea. Considering the previous knowledge of his errand, the fortunate conduct of the operation to the time of its interruption, the gentle breezes that prevailed and that were expectable at that season, the general favorable holding of the anchors, the proximity to the sea in case of storm, the general easterly source of the winds as shown by the log and other evidence, the abundance of deep water at and for some distance within the keys, the breadth of the channel at that point, the opportunity to use additional anchors, the conclusion cannot be escaped that the captain was timorous, rather than conservative and duly cautious; that he was too expectant of possible harm to his vessel, chartered for use on or about a coral reef, and too indifferent to the pecuniary sacrifice his departure entailed upon the libelant in the premature dissolution of the enterprise after the great expense of initiating it, and that he shut his eyes too readily and obstinately to all resources suggested to him, or of which he should have been cognizant. It is true that upon the trial objections relating either to loss of time or ineffectiveness were interposed to all suggested measures of which the Helios might have availed. It was shown that the Crosby went ashore by her anchor dragging, but that would not have happened had she been a steamer; and the divers vessels wrecked without the reef excite or terrify the imagination. Undoubtedly, danger lurks in all things, yet seamen undertaking adventures in tropical regions are not expected to experience the dismay that would come to the inexperienced, but rather to be intrepid, resourceful, and helpful. The captain's consciousness of the possible, but improbable, to a degree ruined the enterprise, and so far compensation should be made.

After hearing and reading the evidence taken in court, and reading all the evidence taken elsewhere, the conclusion is irresistible that the Helios has failed to fulfill the charter, and that by her departure against the request expressed by Hagerty a loss occurred for which compensation should be made. The rule for measuring the damages has not been presented, and will be considered in the first instance by the commissioner. While his due action should not be constrained by any present suggestion of the court, it is proper to state that, if the failure to secure more of the iron is involved in ascertaining the damages, as seems probable, it should be considered that during the latter part of the service it required about $1\frac{1}{2}$ days to load the barge, and about the same time to unload it,—some 3 days in all. The captain of the Helios so states. Some time was lost—perhaps not more than one day—by the steamer going to Mole St. Nicholas, and 10 or 12 days were lost at Havana. As the case now stands, some 12 or 13 days were lost, and only the iron recoverable during the time lost, whatever it was, may be considered, because under the charter the vessel should have been returned to New York at the time she actually arrived. The charter was for about six weeks, and not for the enterprise. The vessel was under charter for eight weeks, and the respondent accepted payment for that time. Hence

her owner may not now urge that the charter was for a shorter period. The question is whether, by fault of the Helios, the charterer was deprived of profitable use of the ship during any part of that time, and, if so, what legal damages accrued therefrom. The libelant's contention that the vessel was obliged to remain until all the iron was aboard is not approved, unless it could have been loaded and delivered, and the ship returned to New York, within the time actually occupied. It is not understood how a charter party for about a fixed time can be extended to cover the completion of an enterprise. The libelant judged that it could be done in six weeks, and for the purpose of covering unexpected delays the word "about" was used. Certainly, the space of two weeks should be the limit of such extension under the facts now presented. It may be that other elements of damage will be urged. It is not intended to fix or to suggest a rule of damage, but only to construe the charter in the matter of its duration.

## THE C. F. ROE et al.

### (District Court, E. D. New York. April 16, 1901.)

TOWAGE—LIABILITY OF TUG FOR INJURY TO TOW.

A tug held in fault for an injury received by a schooner in tow, by striking against the piling at the side of a railway bridge, the draw of which was not opened in response to the tug's signal, on the ground that it failed to act with sufficient promptness in stopping the tow, as was its custom, being familiar with the locality, and with the fact that the draw might be found closed, when the tug came in full view of it, on account of the near approach of trains.

In Admiralty. Suit to recover damages for injury to tow.

Hyland & Zabriskie, for libelant.
William J. Kelly, for Long Island R. Co.
James J. Macklin, for The C. F. Roe.