## OSAKA SHOSEN KAISHA ET AL. *v.* PACIFIC EXPORT LUMBER COMPANY.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 129. Submitted November 23, 1922.—Decided January 2, 1923.

1. Whether the ship is subject to a lien to secure damages resulting from breach of a maritime affreightment contract, is a question of maritime law not controllable by a state statute. P. 495.
2. Acceptance of part of the designated cargo under a contract of affreightment creates no lien upon the ship for damages resulting from refusal to take all. P. 495.
3. The maritime lien or privilege adhering to a vessel is a secret one which may operate to the prejudice of genere creditors and purchasers without notice, and is therefore *stricti juris,* not to be extended by construction, analogy, or inference. P. 499.
4. The lien, created by law, presupposes mutuality and reciprocity as between ship and cargo. P. 499.

272 Fed. 799, reversed.

CERTIORARI to a decree of the Circuit Court of Appeals, affirming a decree of the District Court for the libelant (the present respondent) in a proceeding *in rem* to enforce a claim of maritime lien.

*Mr. William H. Hayden* for petitioners. *Mr. Frank Adams Huffer* and *Mr. Gerald H. Bucey* were also on the briefs.

*Mr. Erskine Wood* for respondent.

The moment a ship enters upon the performance of her charter by taking even a small part of the cargo on board, she binds herself to the performance of her contract just as if she were a living being. Her taking on part of the cargo is her signature to the contract, so that whereas prior to that act, only her owner was liable *in personam*, after that act she herself becomes liable *in rem;* in other words, a maritime lien in favor of the charterer has arisen against her.

Our opponents, building up their case on the maxim that the ship is bound to the cargo and the cargo to the ship, say that it is impossible there should be a lien on the Saigon for leaving part of the lumber behind, because the ship had no lien on this left-behind cargo, and that unless there is such reciprocity of liens there can be no lien at all.

The point is an interesting one that has never been passed upon by this Court, though we think the current of authority as it may be followed through the history of maritime law is in our favor. Consulato de la Mer, c. 209; Benedict, 4th ed., § 131; Marine Ordinances, Louis XIV, "Maritime Contracts," § XI, Tit. I.

We concede that the old continental maritime law that a ship was liable for breach of an executory contract of affreightment, has been modified in this country to the extent that she is no longer liable *in rem* when the contract remains wholly executory. But, we contend, that is the extent of the modification; and where a ship partly

executes the contract, as by taking on part of her cargo, she herself is liable for all breaches of the contract. The argument on this point may be summarized thus:

1. Under the old continental codes ships were liable *in rem* for breaches of contracts made by the managing owner on their behalf, including executory contracts of affreightment.

2. Even if this were not true, such was certainly the law of this country as announced in the earlier decisions of our admiralty courts, up to the time of *The Freeman,* 18 How. 182, and *The Yankee Blade,* 19 How. 82.

3. *The Yankee Blade* and *The Freeman* did not really settle the point, but they did contain *dicta* that a vessel was not liable for breach of a contract of affreightment which was purely executory.

4. In deference to these *dicta* the lower courts have decided that purely executory contracts do not bind the vessel.

5. But this is the limit of the extent to which the old law has been modified, and the lower courts, as if jealous to preserve that old law, in so far as the *dicta* will allow, have many times held that where the vessel partly executes the contract, as by taking on part of the cargo, she herself becomes liable *in rem* for all breaches of the contract.

6. The statement by counsel that the liens must be reciprocal, that the ship is bound to the cargo and the cargo to the ship, relates to the case where the cargo has been delivered to the ship, and is true so far as it goes. But it in no way contradicts the theory that the lien on the ship may go further. It is in no way inconsistent with the theory that she is liable for breaches of her partly executed contracts, even where she has no corresponding lien in return. There are many cases of liens on ships with no reciprocal lien in their favor. As witness breach of her contract to carry a passenger. *The Rebecca,* 1

Ware, 188; *The Paragon,* Fed. Cas. No. 10,708; *The Trib-une,* 3 Sumner, 144; *The Flash,* 1 Abb. Adm. 67; *The Pacific,* 1 Blatchf. 569; *Oakes* v. *Richardson,* 2 Lowell, 173; *The Williams,* 1 Brown Adm. Rep. 208; *The Her-mitage,* 4 Blatchf. 474; *The Ira Chaffee,* 2 Fed. 401; *The Monte A,* 12 Fed. 331; *The J. F. Warner,* 22 Fed. 342; *The Director,* 26 Fed. 708; *The Missouri,* 30 Fed. 384; *The Guilio,* 34 Fed. 909; *The Starlight,* 42 Fed. 167; *The Oscoda,* 66 Fed. 347; *The Eugene,* 83 Fed. 222; 87 Fed. 1001; *The Helios,* 108 Fed. 279; *The Oceano,* 148 Fed. 131; *The Margaretha,* 167 Fed. 794; *Wilson* v. *Peninsula Bark & Lumber Co.,* 188 Fed. 52; *The Thomas P. Shel-don,* 118 Fed. 945; *The S. L. Watson,* 118 Fed. 952; *Stone* v. *The Relanpago,* Fed. Cas. No. 13,486.

It is to be noted, in considering this reciprocal relation of liens, that the lien of a vessel on her cargo is of an entirely different nature and origin from the lien of the cargo on the vessel. The lien of the cargo on the vessel is of a higher order. It is a *jus in re* and follows the ship into whosoever hands the ship goes. The lien on the cargo, upon the other hand, is not a *jus in re* but a mere possessory lien and is lost the moment the cargo leaves her possession. The lien on the cargo is nothing more than the right to hold the goods until the freight is paid.

It is hardly necessary to point out that where a vessel enters upon the performance of her contract of affreight-ment by actually taking on a portion of her cargo, she has signified by as definite and conspicuous an act as it is possible for her to perform that she is undertaking a con-tract and is herself bound for its performance. You could hardly have a more definite rule or test than that. And the lien arising would be no more " secret " than a lien for seamen's wages, salvage, general average, collision, materials, supplies, repairs, necessaries, bottomry loans, pilotage, wharfage, or any other of the liens which a ship's activities may give rise to.

It would surely be a great miscarriage of justice to allow this Saigon Maru, after deliberately refusing to receive part of the cargo, to then say that we had no lien on her because she had no lien on that part of the cargo which she herself had wrongfully refused. This would be to permit her to profit by her own wrong. We can see no more reason for denying the lien under the state statute in this case, on the ground of lack of uniformity, than for denying it in those quite numerous death cases where the state statutes have been invoked to give a lien where the maritime law gave none.

[Argument was made on the construction as well as the applicability of the statute; the amount of deckload; the seaworthiness of the vessel; and the measure of damages.]

MR. JUSTICE McREYNOLDS delivered the opinion of the Court.

March 19, 1917, through its agent at Tacoma, Wash., Osaka Shosen Kaisha, incorporated under the laws of Japan and owner of the Japanese steamer "Saigon Maru," then at Singapore, chartered the whole of that vessel, including her deck, to respondent Lumber Company to carry a full cargo of lumber from the Columbia or Willamette River to Bombay. In May, 1917, the vessel began to load at Portland, Ore. Having taken on a full under-deck cargo and 241,559 feet upon the deck, the captain refused to accept more. After insisting that the vessel was not loaded to capacity and ineffectively demanding that she receive an additional 508,441 feet, respondent libeled her, setting up the charter party and the captain's refusal, and claimed substantial damages. The owner gave bond; the vessel departed and safely delivered her cargo.

The Lumber Company maintains that it suffered material loss by the ship's refusal to accept a full load; that

she is liable therefor under the general admiralty law and also under the Oregon statute (Olson's Laws of Oregon, § 10,281), which declares every vessel navigating the waters of the State shall be subject to a lien for the damages resulting from non-performance of affreightment contracts.

Petitioner excepted to the libel upon the ground that the facts alleged showed no lien or right to proceed *in rem.* The trial court ruled otherwise and awarded damages upon the evidence. 267 Fed. 881. The Circuit Court of Appeals approved this action. 272 Fed. 799.

Little need be written of the claim under the state statute. The rights and liabilities of the parties depend upon general rules of maritime law not subject to material alterations by state enactments. *The Roanoke,* 189 U. S. 185; *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205; *Union Fish Co.* v. *Erickson,* 248 U. S. 308.

Both courts below acted upon the view that while the ship is not liable *in rem* for breaches of an affreightment contract so long as it remains wholly executory, she becomes liable therefor whenever she partly executes it, as by taking on board some part of the cargo. In support of this view, it is said: Early decisions of our circuit and district courts held that under maritime law the ship is liable *in rem* for any breach of a contract of affreightment with owner or master. That *The Freeman* (1856), 18 How. 182, 188, and *The Yankee Blade* (1857), 19 How. 82, 89, 90, 91, modified this doctrine by denying such liability where the contract remains purely executory, but left it in full force where the vessel has partly performed the agreement, as by accepting part of the indicated cargo. *The Hermitage,* 12 Fed. Cas. No. 6410; *The Williams,* 29 Fed. Cas. No. 17,710; *The Ira Chaffee,* 2 Fed. 401; *The Director,* 26 Fed. 708; *The Starlight,* 42 Fed. 167; *The Oscoda,* 66 Fed. 347; *The Helios,* 108 Fed. 279; *The Oceano,* 148 Fed. 131; *Wilson* v. *Peninsula Bark & Lumber Co.,* 188 Fed. 52, were cited.

We think the argument is unsound.

Prior to *The Freeman* and *The Yankee Blade*, this Court had expressed no opinion on the subject; but, so far as the reports show, the lower courts had generally asserted liability of the ship for breaches of affreightment contracts. " It is grounded upon the authority of the master to contract for the employment of the vessel, and upon the general doctrine of the maritime law, that the vessel is bodily answerable for such contracts of the master made for her benefit." *The Flash,* 1 Abb. Adm. 67, 70; *The Rebecca,* 1 Ware, 188; *The Ira Chaffee, supra.* Since 1857, some of the lower courts have said that the ship becomes liable for breaches of affreightment contracts with her owner or master whenever partly executed by her; but it is forcibly maintained that in none of the cases was the point directly involved. *The Hermitage, The Williams, The Ira Chaffee, The Director, The Starlight, The Oscoda, The Helios, The Oceano, Wilson* v. *Peninsula Bark & Lumber Co., supra.*

*The Freeman* and *The Yankee Blade* distinctly rejected the theory of the earlier opinions. They are inconsistent with the doctrine that partial performance may create a privilege or lien upon the vessel. And in so far as the lower courts express approval of this doctrine in their more recent opinions, they fail properly to interpret what has been said here.

While, perhaps, not essential to the decision, this Court, through Mr. Justice Curtis, said in *The Freeman:* " Under the maritime law of the United States the vessel is bound to the cargo, and the cargo to the vessel, for the performance of a contract of affreightment; but the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and a cargo shipped under it."

In *The Yankee Blade,* Mr. Justice Grier, speaking for the Court, declared:

" The maritime ' privilege ' or lien is adopted from the civil law, and imports a tacit hypothecation of the subject of it. It is a ' *jus in re*,' without actual possession or any right of possession. It accompanies the property into the hands of a bona fide purchaser. It can be executed and divested only by a proceeding *in rem*. This sort of proceeding against personal property is unknown to the common law, and is peculiar to the process of courts of admiralty. The foreign and other attachments of property in the State courts, though by analogy loosely termed proceedings *in rem*, are evidently not within the category. But this privilege or lien, though adhering to the vessel, is a secret one; it may operate to the prejudice of general creditors and purchasers without notice; it is therefore ' *stricti juris*,' and cannot be extended by construction, analogy, or inference. 'Analogy,' says Pardessus, (Droit Civ., vol. 3, 597,) ' cannot afford a decisive argument, because privileges are of *strict right*. They are an exception to the rule by which all creditors have equal rights in the property of their debtor, and an exception should be declared and described in express words; we cannot arrive at it by reasoning from one case to another.'

" Now, it is a doctrine not to be found in any treatise on maritime law, that every contract by the owner or master of a vessel, for the future employment of it, hypothecates the vessel for its performance. This lien or privilege is founded on the rule of maritime law as stated by Cleirac, (597:) ' Le batel est obligée à la marchandise et la marchandise au batel.' The obligation is mutual and reciprocal. The merchandise is bound or hypothecated to the vessel for freight and charges, (unless released by the covenants of the charter-party,) and the vessel to the cargo. The bill of lading usually sets forth the terms of the contract, and shows the duty assumed by the vessel. Where there is a charter-party, its

45646°—23——32

covenants will define the duties imposed on the ship. Hence it is said, (1 Valin, Ordon. de Mar., b. 3, tit. 1, art. 11,) that 'the ship, with her tackle, the freight, and the cargo, are respectively bound (affectée) by the covenants of the charter-party.' But this duty of the vessel, to the performance of which the law binds her by hypothecation, is to deliver the cargo at the time and place stipulated in the bill of lading or charter-party, without injury or deterioration. If the cargo be not placed on board, it is not bound to the vessel, and the vessel cannot be in default for the non-delivery, in good order, of goods never received on board. Consequently, if the master or owner refuses to perform his contract, or for any other reason the ship does not receive cargo and depart on her voyage according to contract, the charterer has no privilege or maritime lien on the ship for such breach of the contract by the owners, but must resort to his personal action for damages, as in other cases. . . .

"And this court has decided, in the case of *The Schooner Freeman* v. *Buckingham,* 18 Howard, 188, 'that the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and a cargo shipped under it.'"

In *Bulkley, Claimant of the Barque Edwin,* v. *Naumkeag Steam Cotton Co.,* 24 How. 386, 393, the barque was libeled to recover damages for not delivering part of the cotton—707 bales—which the master had agreed to carry from Mobile to Boston. With most of the cargo on board the vessel was towed below the bar, there to receive the remainder from lighters. A lighter carrying 100 bales sank, and the cotton was lost or damaged. The barque delivered 607 bales at Boston in good condition. The owner of the vessel claimed exemption for her upon the ground that she never received the 100 bales. This Court said: "In the present case the cargo was delivered

·in pursuance of the contract, the goods in the custody of the master, and subject to his lien for freight, as effectually as if they had been upon the deck of the ship, the contract confessedly binding both the owner and the shipper; and, unless it be held that the latter is entitled to his lien upon the vessel also, he is deprived of one of the privileges of the contract, when, at the same time, the owner is ·in the full enjoyment of all those belonging to his side of it."

Later opinions approve the same general rule.

" The doctrine that the obligation between ship and cargo is mutual and reciprocal, and does not attach until the cargo is on board, or in the custody of the master, has been so often discussed and so long settled, that it would be useless labor to restate it, or the principles which lie at its foundation. The case of the *Schooner Freeman* v. *Buckingham,* decided by this court, is decisive of this case." *The Lady Franklin,* 8 Wall. 325, 329.

" It is a principle of maritime law that the owner of the cargo has a lien on the vessel for any injury he may sustain by the fault of the vessel or the master; but the law creates no lien on a vessel as a security for the performance of a contract to transport a cargo until some lawful contract of affreightment is made, and the cargo to which it relates has been delivered to the custody of the master or some one authorized to receive it." *The Keokuk,* 9 Wall. 517, 519.

The maritime privilege or lien, though adhering to the vessel, is a secret one which may operate to the prejudice of general creditors and purchasers without notice and is therefore *stricti juris* and cannot be extended by construction, analogy or inference. *The Yankee Blade, supra.* The contract of affreightment itself creates no lien, and this Court has consistently declared that the obligation between ship and cargo is mutual and reciprocal and does not attach until the cargo is on board or in

the master's custody. We think the lien created by the law must be mutual and reciprocal; the lien of the cargo owner upon the ship is limited by the corresponding and reciprocal rights of the ship owner upon the cargo. See *The Thomas P. Sheldon,* 113 Fed. 779, 782, 783.

The theory that partial acceptance of the designated cargo under a contract of affreightment creates a privilege or lien upon the ship for damages resulting from failure to take all, is inconsistent with the opinions of this Court and, we think, without support of adequate authority. In *The S. L. Watson,* 118 Fed. 945, 952, the court well said:

" The rule of admiralty, as always stated, is that the cargo is bound to the ship and the ship to the cargo. Whatever cases may have been decided otherwise disregarded the universal fact that no lien arises in admiralty except in connection with some visible occurrence relating to the vessel or cargo or to a person injured. This is necessary in order that innocent parties dealing with vessels may not be the losers by secret liens, the existence of which they have no possibility of detecting by any relation to any visible fact. It is in harmony with this rule that no lien lies in behalf of a vessel against her cargo for dead freight, or against a vessel for supplies contracted for, but not actually put aboard. *The Kiersage,* 2 Curt. 421, Fed. Cas. No. 7,762; Pars. Ship. & Adm. (1869), 142, 143. It follows out the same principle that Mr. Justice Curtis states in *The Kiersage,* 2 Curt. 424, Fed. Cas. No. 7,762, that admiralty liens are *stricti juris,* and that they cannot be extended argumentatively, or by analogy or inference. He says, ' They must be given by the law itself, and the case must be found described in the law.' "

*Reversed.*