### THE PACIFIC CEDAR.

### KRAUSS BROS. LUMBER CO. v. DIMON S. S. CORPORATION.

#### No. 6660.

Circuit Court of Appeals, Ninth Circuit.
Sept. 8, 1932.

On Petition for Modification of Opinion, Nov. 7, 1932.

Lane Summers and Hayden, Merritt, Summers & Bucey, all of Seattle, Wash., for appellant.

Lawrence Bogle, Cassius E. Gates, Claude E. Wakefield, and Bogle, Bogle & Gates, all of Seattle, Wash., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

The appellant filed a libel in rem against the steamship Pacific Cedar, and in personam against her owner. The trial court sustained the exception to the libel filed by the respondent upon the ground that admiralty was without jurisdiction over the matter and·dismissed the libel. From this decree the libelant takes this appeal.

The object of the action is to recover an overpayment of freight made by the libelant to the respondent. The claim arises from the contingent character of the contract of affreightment contained in the "booking agreement" dated November 22, 1929, by which the respondent undertook to carry the libelant's lumber loaded about January 17, 1930, at Puget Sound and Grays Harbor to Philadelphia or New York for $10 per thousand feet net measurement, but, "in the event regular intercoastal carrier moves similar cargo at lower rate, such lower rate is to be applied." The lumber was loaded between January 18 and January 25, 1930, and was discharged at New York, Philadelphia and Baltimore between March 1 and 20, 1930. During that period respondent demanded and received $14,657.30 freight thereon, being at the rate of $10 per thousand net measurement. In the month of January a regular intercoastal carrier, the Luckenbach Steamship Company, moved similar cargo from Seattle, Wash., to Boston, Mass., at the rate of $8.50 per thousand feet, consequently the freight that should have been charged and collected by re-

spondent at this lower rate was $12,458.71, wherefore libelant seeks to collect the difference of $2,198, with interest at 6 per cent. per annum from March 20, 1930. There is no allegation that either party to the contract of affreightment knew of the carriage of lumber at the lower rate by the Luckenbach Steamship Company, nevertheless the respondent demanded and received the higher rate. The position of the appellee is thus stated in its brief:

"Appellee admits here, and has never contended otherwise, that a contract of affreightment is maritime. From this fact, however, it does not follow that the matter before the court in this case is maritime, merely because it is based upon a clause physically contained in a contract of affreightment. Such appears to be appellant's contention.

"A contract of affreightment is within admiralty jurisdiction because it is primarily a maritime contract with respect to the ship, cargo and freight. Any breach of such contract in connection with the loading, carriage and safe delivery of cargo having to do with the ship, cargo or freight, is certainly within admiralty jurisdiction, but after the affreightment has been fully performed by safe delivery, according to the terms of the contract, and freight voluntarily paid by the shipper, an action by the shipper (appellant here) to recover from the carrier a sum of money alleged to be due by reason of a contingent claim to-wit: that some other intercoastal carrier carried similar cargo at a lesser rate, and not based upon a claim connected in any way with the maritime features of such contract, or the duties imposed or arising out of said contract, is certainly not maritime. Such action is one in assumpsit to recover money had and received."

We think it clear, however, that the contingent agreement is not so remote from the contract of affreightment as appellee indicates. It is not an agreement to rebate freight earned but fixes the freight by reference to the conduct of competitors. The agreement was to pay $8.50 and no more, as it turned out, consequently the demand by the appellee for payment in excess of that amount was unauthorized and was clearly a violation of the express terms of the contract, although apparently neither party at that time knew of that fact.

As we understand it, appellee concedes that, had the appellant raised the contention that the freight rate was $8.50 per thousand before delivery, and had appellee compelled the payment of $10 per thousand as a condition to delivery, admiralty would have jurisdiction of the action to recover the overpay-

ment thus exacted as a condition to delivery. At any rate, this court has decided in Tatsuuma K. K. K. v. Robert Dollar Co., 31 F. (2d) 401, 402, that excessive charges thus exacted can be recovered in admiralty. District Judge Bean, speaking for this court, there said: "It is urged by the appellant that the matter here involved is not cognizable in admiralty. But the issue between the parties cannot be determined without a consideration and review of the terms of the bill of lading, and, as said by Gibson, District Judge, speaking for the Court of Appeals in 286 F. 918: 'From time immemorial the construction of such contracts, and the determination of issues arising out of them, has been part of the duties of courts of admiralty.' U. S. Shipping Bd. v. Banque Russo Asiatique. See, also, The G. A. Tomlinson (D. C.) 279 F. 786; The John Francis (D. C.) 184 F. 746; The Lake Eckhart (D. C.) 31 F.(2d) 804, 1924 A. M. C. 498."

■ The contract of affreightment is as definitely determined to be a maritime contract as is a charter party. For instance, the Supreme Court in Morewood et al. v. Enequist, 23 How. 491, 493, 16 L. Ed. 516, thus stated the matter:

"In the argument in this court, the counsel, without abandoning the original defence, have expended much learning and ingenuity in an attempt to demonstrate that a court of admiralty in this country, like those of England, has no jurisdiction over contracts of charter-party or affreightment. They do not seem to deny that these are maritime contracts, according to any correct definition of the terms, but rather require us to abandon our whole course of decision on this subject, and return to the fluctuating decisions of English common-law judges, which, it has been truly said, 'are founded on no uniform principle, and exhibit illiberal jealousy and narrow prejudice.'

"The errors of those decisions have mostly been corrected by legislation in the country of their origin; they have never been adopted in this.

"We do not feel disposed to be again drawn into the discussion of the arguments which counsel have reproduced on this subject. The case of New Jersey Steam Nav. Co. v. Merchants' Bank of Boston (6 How. 344 [12 L. Ed. 465]) was twice argued (in 1847 and 1848) at very great length. The whole subject was most thoroughly investigated both by counsel and the court. Everything connected with the history of courts of admiralty, from the reign of Richard the Second to the present day—everything which the industry, learning, and research, of most able counsel could discover, was brought to our notice. We then decided that charter-parties and contracts of affreightment are 'maritime contracts' within the true meaning and construction of the Constitution and act of Congress, and cognizable in courts of admiralty by process either in rem or in personam."

■ In Red Cross Line v. Atlantic Fruit Co., 264 U. S. 109, 44 S. Ct. 274, 68 L. Ed. 582, the Supreme Court had under consideration an action to recover money paid as charter hire where the vessel hired failed to make the voyage; the court held that the claim was within admiralty jurisdiction, and stated, at page 120 of 264 U. S., 44 S. Ct. 274, 275, 68 L. Ed. 582: "The claim to recover an amount paid under a charter party as charter hire is within the admiralty jurisdiction. Morewood v. Enequist, 23 How. 491, 16 L. Ed. 516."

In a more recent case (Matson Nav. Co. v. U. S., 284 U. S. 352, 52 S. Ct. 162, 76 L. Ed. 336, decided January 4, 1932), where the plaintiff sought to recover compensation in the Court of Claims for increased wages and bonuses paid by it to the masters and crews of seven vessels operated by it for the United States, it was held that the agreement for the operation of the ships was maritime, and that the Court of Claims was without jurisdiction to determine the matter which was within admiralty jurisdiction. If an action to recover unpaid charter hire is cognizable in admiralty after the charter party has expired, it would seem that an action to recover unpaid freight would likewise be within admiralty jurisdiction (see 36 Cyc. 312, § 5; Thatcher v. McCulloh, 23 F. Cas. No. 13,862), and, if an action to recover additional freight would be so cognizable, it is equally clear that an action to recover an overpayment would likewise be within admiralty jurisdiction. It is true that Judge Learned Hand in Israel v. Moore & McCormack Co. (D. C.) 295 F. 919, 920, decided April 8, 1920, held that freight overpaid by mistake of the consignee due to the fact that a portion of the cargo had been jettisoned could not be recovered in admiralty because such recovery was based upon a legal fiction which implied a promise to repay the excessive charges, when in fact no such agreement existed. He thus distinguished the case before him from that of The Oceano (D. C.) 148 F. 131, where the charterer sued to recover an overpayment of freight due to the failure of the ship to deduct certain payments made by the charterer, as had been agreed. In the case at bar, we have an agreement in

the contract of affreightment to deduct from the $10 rate any amount over the charge made by a regular intercoastal carrier for moving similar cargo to the East Coast. If there is a reasonable basis for this distinction between an express and an implied agreement to reduce freight, as applied to an overpayment of freight, the case at bar comes within the rule announced in The Oceano, supra, which Judge Hand thus distinguishes from his decision in Israel v. Moore & McCormack Co., supra: "The ship [The Oceana] had agreed to deduct from the freight all disbursements paid by the charterer who mistakenly overpaid her. The right of recovery rested upon the ship's unfulfilled promise, and could indeed have been so pleaded at law, the payment and mistake in payment being successively pleaded in a voidance as plea and replication. The right to sue in indebitatus assumpsit should not obscure that very obvious difference."

We do not find that the decision of Judge Hand has been cited on this point in any later case. In the case at bar, as we have pointed out, the amount overpaid was exacted in violation of the express contract of affreightment, and the question of the amount of freight to be paid depends upon the interpretation of that contract.

We think it clear from the foregoing authorities that, where the agreement of affreightment, by or on behalf of the ship, required the transportation of the cargo for $8.50 per thousand feet of lumber and the ship exacts the greater rate of $10 per thousand feet, and the same is voluntarily paid by reason of mutual mistake at the time of delivery, admiralty has jurisdiction over an action to recover such overpayment in a libel in personam.

The question remaining is whether there is a maritime lien against the steamship Pacific Cedar which can be enforced in admiralty in rem. The basis for a maritime lien upon the ship in cases involving a contract of affreightment is thus stated by the Supreme Court in Vandewater v. Mills (The Yankee Blade) 60 U. S. (19 How.) 82, 90, 15 L. Ed. 554: "This lien or privilege is founded on the rule of maritime law as stated by Cleirac, (597:) 'Le batel est obligee a la marchandise et la marchandise au batel.' The obligation is mutual and reciprocal. The merchandise is bound or hypothecated to the vessel for freight and charges, (unless released by the covenants of the charter-party,) and the vessel to the cargo. The bill of lading usually sets forth the terms of the contract, and shows the duty assumed by the vessel. Where there is a charter-party, its covenants will define the duties imposed on the ship. Hence it is said, (1 Valin, Ordon. de Mar., b. 3, tit. 1, art. 11,) that 'the ship, with her tackle, the freight, and the cargo, are respectively bound (affectée) by the covenants of the charter-party.' But this duty of the vessel, to the performance of which the law binds her by hypothecation, is to deliver the cargo at the time and place stipulated in the bill of lading or charter-party, without injury or deterioration."

In the case of Osaka Shosen Kaisha v. Pacific Export Lbr. Co., 260 U. S. 490, 499, 43 S. Ct. 172, 174, 67 L. Ed. 364, this doctrine was reiterated by the Supreme Court, as follows: "The maritime privilege or lien, though adhering to the vessel, is a secret one which may operate to the prejudice of general creditors and purchasers without notice and is therefore stricti juris and cannot be extended by construction, analogy or inference. Vandewater v. Mills, supra. The contract of affreightment itself creates no lien, and this court has consistently declared that the obligation between ship and cargo is mutual and reciprocal and does not attach until the cargo is on board or in the master's custody. We think the lien created by the law must be mutual and reciprocal; the lien of the cargo owner upon the ship is limited by the corresponding and reciprocal rights of the shipowner upon the cargo. See The Thomas P. Sheldon (D. C.) 113 F. 779, 782, 783."

To enforce a lien against the ship where neither the owner or master of the ship on the one hand, or the owner of the cargo on the other, knew of the facts upon which the lien is predicated until after the right delivery of the cargo, and where no visible fact or occurrence would give notice of the lien to the public, would press the doctrine of a maritime lien beyond reason and beyond authoritative decision. We concur in the conclusion of the trial judge that under the circumstances of this case no maritime lien exists on the ship.

The decree dismissing the libel in rem is affirmed, and the dismissal of the libel in personam is reversed, with directions to the trial court to enter a judgment against the Dimon Steamship Corporation for $2,198, with interest at 6 per cent. from March 20, 1930.

On Petition for Modification of Opinion.

WILBUR, Circuit Judge.

Appellee petitions for the modification of the order in so far as it directs an entry of a judgment against the Dimon Steamship Cor-

poration for $2,198, with interest at 6 per cent. from March 20, 1930. The petitioner has apparently assumed throughout that, in the event its exceptions to the jurisdiction of the admiralty court were not sustained, it would have leave to file an answer. No application was made in this court for leave to answer in the event that the order of the District Court sustaining the exceptions was reversed. In view of the fact that the hearing in this court was a trial de novo, an order was made finally disposing of the matter by directing the entry of a judgment in favor of the appellant. It is evident from the petition that the appellee was taken by surprise by the order made. The appellant did not request or contend that the order of this court, if predicated upon a reversal of the order of the trial court, should direct an entry of the judgment.

Appellee states in its petition, "Appellee has a defense in this case and one which will clearly defeat any recovery by the appellant." We are not yet advised of the nature of this defense.

Appellee will be given thirty days in which to apply to this court for leave to file its proposed answer; ten days' notice of the application will be given to the appellant.