## INLAND WATERWAYS CORPORATION v. STANDARD COMMERCIAL TOBACCO CO., Inc., et al.

### No. 6607.

Circuit Court of Appeals, Fifth Circuit.
June 20, 1933.

Edouard F. Henriques, Sp. Asst. in Admiralty to U. S. Atty., of New Orleans, La., for appellant.

Geo. H. Terriberry, Jos. M. Rault and Eugie V. Parham, all of New Orleans, La., and Henry N. Longley, of New York City, for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

Seven hundred and eighty-five hogsheads of tobacco were shipped from Kentucky to New Orleans by barges of Inland Waterways Corporation, a common carrier, to be delivered to a vessel sailing for Danzig, also a common carrier. Standard Commercial Tobacco Company, having contracted to buy the tobacco, paid for it while en route to New Orleans and contracted to resell it before it reached Danzig, but it being found damaged on arrival there, delivered it later and collected the price with deduction in an unproven amount for the damage. Standard Commercial Tobacco Company, on a libel in personam against Inland Waterways Corporation and in rem against the motorship Tampa, obtained a decree of liability against the former but exonerating the latter, with a reference to a commissioner to fix the amount. Inland Waterways Corporation appeals.

The damage on survey at Danzig was found to be due to fresh water and oil, and according to some of the witnesses also to sea water. It is shown without contradiction that the tobacco arrived in New Orleans in good order and was stored there by appellant on an open wharf but covered with tarpaulins pending the arrival of the ship. A heavy rain of 1.41 inches lasting over an hour occurred on August 6th, and one of .39 inches lasting for ten or fifteen minutes occurred August 8th while the ship was loading the tobacco. The ship took on over 1,000 tons of fuel oil the next day, and discharged the greater part of it at Bergen, August 29th, having been swept meanwhile by heavy seas on two days during the passage. On August 31st and September 1st it discharged the tobacco at Danzig in slight showers insufficient to do much harm. The damage, whether by fresh water, salt water, or oil happened either at New Orleans or on shipboard.

The libelant bought the tobacco delivered at New Orleans, but it does not appear that the bills of lading under which it was moving

thither were transferred to it. The bills issued by the ship were issued in libelant's name. Since all the damage is plainly shown to have been caused at New Orleans or on shipboard after libelant had become the owner of the tobacco and before it parted with title after the cargo arrived at Danzig, libelant was properly held entitled to sue both carriers.

The liability of the carriers is several. By the original bills of lading the tobacco was to be delivered by Inland Waterways Corporation at New Orleans to the ship for Danzig, but in consideration of its own separate freight. The ship issued its own contract of carriage, not adopting the original one. Each carrier is bound, in the absence of statute or contract otherwise, only for safe carriage over its own line and safe delivery to the next connecting carrier; and the liability for the safety of the goods commences when they are received and is discharged by delivery to and acceptance by the succeeding carrier. Oregon-Washington R. R. & Navigation Co. v. McGinn, 258 U. S. 409, 42 S. Ct. 332, 66 L. Ed. 689. On proof of damage by the owner of the goods the first carrier has the burden of showing delivery in good order to the connecting carrier, and as to goods accepted by the latter as in good order the second carrier has the burden of showing that any damage subsequently appearing was really inflicted before it got the goods. While libelant would have no lien and could not proceed in rem against the ship for a wrongful refusal to carry goods which were never put aboard, for damage done to those actually carried there is a lien. Osaka Kaisha v. Pacific Export Lumber Co., 260 U. S. 490, 43 S. Ct. 172, 67 L. Ed. 364. They may become cargo entitled to a lien before actual deposit on ship if brought alongside on wharf or lighter and custody for immediate carriage is accepted by the ship's officers. Bulkley v. Naumkeag Steam Cotton Co., 24 How. 286, 16 L. Ed. 599; The Oregon, 18 Fed. Cas. page 760, No. 10,553. Logs delivered afloat to the ship were held cargo though never taken aboard in The Olga S. (C. C. A.) 25 F.(2d) 229, and McLeod Lumber Co. v. Crowley (D. C.) 8 F.(2d) 283. In The Cordillera, 6 Fed. Cas. page 545, No. 3,229(a), the lighterer had independent custody and control on his lighter and liability passed to the ship as the goods were placed by him in its slings. The giving of a bill of lading is important evidence that the custody of the goods has been taken by the carrier but is neither essential nor conclusive. Brower v. The Water Witch, 4 Fed. Cas. page 323,

No. 1,971; Snow v. Carruth, 22 Fed. Cas. page 724, No. 13,144. Custody of cotton to be shipped and control of the place where it was were thought more important in St. Louis, Iron Mountain R. R. Co. v. Commercial Union Insurance Co., 139 U. S. 223, 11 S. Ct. 554, 35 L. Ed. 154. In Pollard v. Vinton, 105 U. S. 7, 9, 26 L. Ed. 998, the bill of lading given was held not binding if the goods were not in fact delivered, the court saying: "We do not mean that the goods must have been actually placed on the deck of the vessel. If they came within the control and custody of the officers of the boat for the purpose of shipment, the contract of carriage had commenced, and the evidence of it in the form of a bill of lading would be binding." The maritime lien for the safety of the cargo attaches when the cargo is on board or in the master's custody. Osaka Kaisha v. Pacific Export Lumber Co., 260 U. S. at page 497, 43 S. Ct. 172, 67 L. Ed. 364; The Keokuk, 9 Wall. at page 519, 19 L. Ed. 744; The Lady Franklin, 8 Wall. 329, 19 L. Ed. 455. In the case at bar the wharf belonged to neither carrier but had been agreed on by them as the place for delivery of the tobacco. The ship was to load it with its stevedores. The appellant had nothing to do but take its tarpaulins off. The ship like any other consignee was entitled to inspect before accepting the tobacco. Dibble v. Morgan, 7 Fed. Cas. page 648, No. 3,881; The Mary Washington, Fed. Cas. No. 9,229. According to some of the testimony it was all uncovered at once by the stevedores, and the ship's officer with the ship's agent inspected it and the agent advised that exact exceptions should be noted as to some that was wet. This was done on the bill of lading issued after loading was complete. No hogsheads were rejected, though some were required to be recoopered. According to other testimony the hogsheads were uncovered only as loaded. We think the fair conclusion is that the cargo was accepted as it was uncovered with the exception of the casks that were required to be recoopered, and these are not shown to have been damaged as to contents. It follows that when the downpour of rain happened on August 8th after about 200 casks had been loaded those which had been uncovered by or for the stevedores were in their custody and at the risk of the ship.

The evidence does not separately fix the damage due to fresh water or salt water or oil, but all the surveyors say some of it was due to oil and part of them are positive that some of the water damage was due to salt water. They, having heard that the hogsheads

had been rained on while covered with tarpaulins at New Orleans, gave it as their opinion that the oil had been carried into the hogsheads from new tarpaulins by the water. It is testified that tobacco in hogsheads will absorb the odor of oil if any is in its neighborhood, but it does not clearly appear whether this tobacco had oil on it or merely smelled of oil. The opinion of the surveyors as to the source of the oil must yield to the positive and uncontradicted testimony of disinterested witnesses that the tarpaulins used at New Orleans were not new and had never been treated with oil but with wax only. On the other hand, there was much oil taken in and put out of the ship, and oil was her fuel. Some of the tobacco was separated from other cargo on the ship by tarpaulins whose freedom from oil is not established. While the ship's second officer, the sole witness from her crew, denies that any oil escaped or sea water entered her, we think that any damage attributable to either oil or sea water arose necessarily on the ship and cannot be charged against the appellant. As to the fresh water damage there is conflict in the testimony touching the security of the hogsheads under the tarpaulins. That most unfavorable to appellant represents the tarpaulins as not stretched tight but holding water in the valleys made between the hogsheads which all say lay on their sides on the wharf, which water may have run beneath at the laps between the tarpaulins or seeped through where they were defective. It is also testified that the edge of the tarpaulins did not in some places reach the wharf by a foot. The hogsheads, however, were about four feet in diameter and a tarpaulin, though lacking a foot of reaching the wharf, would carry the water well below the bulge of the side, so that water would not run into the cracks. Only at exposed heads would there be any likelihood of its entering. That collecting in the valleys would escape at the lowest point, not on but between the hogsheads, and could wet only a small portion of them. Yet it is claimed that 624 out of the 785 hogsheads had been so wet that tobacco stains exuded and colored the outside of the staves and the contents of some of the hogsheads were damaged as much as 50, 60, and even 80 per cent. The one witness who testified on the subject, an experienced man, says that while the hogsheads are not watertight the tobacco in them when packed as this was, 1,600 pounds to the hogshead under hydraulic pressure of 1,500 pounds, will not if exposed to an ordinary rain of three or four hours be damaged if the water can run off; but if the hogsheads stand in water, damage will be done and stains will appear on that part of the hogshead really standing in the water, but that a shallow puddle of water would do only slight damage. The wharf was of planks, and water could not have collected on it to any great depth. Either the damage has been much exaggerated or more water operated to produce it than has so far been testified about. It is a significant fact that the ship's officers in receipting for the hogsheads after the rain of August 8th, though cautioned by the ship's agent to make full exceptions on the bill of lading, noted only 310 hogsheads as wet. The log puts it "310 hogsheads more or less wet." When complaint of damage to over 600 hogsheads was made at Danzig on September 1st the ship's representative on September 3d wrote, calling attention to the notation on the bill of lading that 310 hogsheads were received wet and "furthermore the vessel encountered heavy weather during her passage which caused her to take over much water," and inclosed a translation of her logs on the subject, the contents of which do not appear. One witness says the tops of the hogsheads were wet with fresh water and the sides with salt water. It does not appear whether they were stowed on end in the ship or not. Our conclusion is that for all salt water and oil damage the present evidence shows that liability, if any, is not on the appellant but on the ship; and for the fresh water damage that inflicted before the hogsheads were uncovered for loading is on the appellant, but any resulting from the rain of August 8th to the hogsheads that had been uncovered for loading is on the ship. The evidence so far taken does not attempt to separate even by estimate these damages. Probably additional light can be thrown on the origin of the damage by further evidence as to the construction of the wharf, the logs referred to in the letter of September 3d touching the entry of sea water into the ship, and as to where in each hogshead the damaged tobacco was found, whether as if it had stood on its side in a puddle or had stood on end in water, or had been deluged all over. There was a real examination of only 110 hogsheads, suspected because of stains, and 11 of these proved not damaged. Mere stains on other hogsheads would not establish damage or the kind or the extent of it. All the hogsheads were sold in Europe, and the purchaser must have inspected each, but his evidence has not been taken. We direct a retrial of the case with leave to both sides to introduce further evidence and

that the source, nature, and extent of damage and the responsibility for it be fixed de novo in one hearing.

The cause is reversed and remanded for further proceedings not inconsistent with this opinion.